STATE of Wisconsin, Plaintiff-Respondent,

v.

Steven T. SMITH, Defendant-Appellant.

Court of Appeals

*No. 02–3404–CR. Submitted on briefs September 2, 2003.—
Decided October 21, 2003.*

**2003 WI App 234**

(Also reported in 671 N.W.2d 854.)

On behalf of the defendant-appellant, the cause was submitted on the brief of *Mark S. Rosen* of *Rosen and Holzman*, Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general and *Kathleen M. Ptacek*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. WEDEMEYER, P.J. Steven T. Smith appeals from an order denying his postconviction motion requesting a new trial due to ineffective assistance of trial counsel, following his conviction for delivery of a controlled substance—cocaine, as a second or subsequent offense contrary to WIS. STAT. § 961.41(1)(cm)1 (2001–02).[2]

¶ 2. Smith contends his trial counsel was prejudicially ineffective for failing to object to the prosecutor's closing argument. Because portions of the prosecutor's closing argument jeopardized the fairness and reliability of the trial, we remand for an evidentiary hearing.

## I. BACKGROUND

¶ 3. A jury found Smith guilty of delivery of cocaine as a repeat offender. The factual basis for the charge against Smith, although contested, is not complicated. On the morning of January 31, 2000, on the north side of the 2700 block of West State Street, a drug buy occurred. The buyer was an undercover police officer by the name of Deneen McClinton. The State alleged that Smith was the seller. McClinton claimed she purchased two corner cuts of cocaine base substance (crack cocaine) from Smith with a prerecorded $20 bill. Smith denied that he was involved in this transaction.

¶ 4. McClinton was not working alone in this buying exercise. Detective Jeffrey Thompson was involved as a "cover" officer to ensure McClinton's safety and to respond should McClinton give a signal indicat-

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

ing that the person she was interacting with ought to be stopped by other officers. Officers Andrew Jones and Michael Crivillo also served as "cover" separately driving unmarked vehicles. When Crivillo was informed that a sale had occurred, he attempted to stop Smith at the corner of 29th and West State Streets. The man police say was Smith did not stop, however, and he began to flee. Jones joined in the chase and finally apprehended Smith in the 2900 block of West Highland Boulevard.

¶ 5. At trial, Smith testified on his own behalf. Succinctly, he stated he did not come into contact with McClinton, did not have a conversation with her, and did not give her anything in exchange for payment.

¶ 6. McClinton testified that on January 31, 2000, she, Thompson, Crivillo, and Jones were working as a team to investigate drug dealing in the area of 27th and State Streets, a known drug area. She encountered a person whom she identified as the accused and asked if he could "hook" her up (street slang for leading her to obtain narcotics). After bargaining with Smith, he agreed to sell her two dime bags of crack cocaine for $20. She paid him with a prerecorded $20 bill. From her experience as an undercover drug buyer, she concluded what Smith gave her were two corner cut baggies containing crack cocaine. According to McClinton, a hand-to-hand transaction took place in front of the residence located at 2722 West State Street. McClinton noted in her report that a distinct feature about Smith was his numerous facial freckles. When the alleged transaction took place, no one else was observed on that side of the street. While Thompson was serving as McClinton's cover, nothing blocked his vision of the two participants. He did not, however, observe any exchange take place between McClinton and Smith. After

the transaction allegedly took place, Smith walked away, westbound on the north side of West State Street.

¶ 7. Thompson observed McClinton and Smith walking together from about twenty or thirty feet to the east on the north side of the street. He noted that Smith was wearing a dark-colored knit cap. At one point, McClinton signaled to Thompson. Thompson then proceeded to follow Smith west on State Street. Thompson notified Jones who, as a backup, was patrolling in an unmarked squad west on State Street. Thompson pointed Smith out to Jones and ordered him to stop Smith. Jones followed Smith in his unmarked squad. At the time, there were no other individuals walking west. A description of Smith was later passed on to Jones. When Smith turned north on 29th Street, Thompson lost sight of him. Jones, however, who was following Smith, turned and drove north on 29th Street. After Thompson asked Jones to follow Smith, Jones never lost sight of Smith up to the time of arrest.

¶ 8. Crivillo, as part of the team, was patrolling the area in an undercover vehicle. He received a broadcast that an individual made a sale and was walking westbound on State Street. He drove south on 29th Street until he arrived at the corner of 29th and West State Streets. There he observed an individual who had just turned the corner off of State Street onto 29th Street. It was Smith. At the same time, he observed Jones in an unmarked squad proceeding west on State Street. Crivillo exited his vehicle and called to Smith to stop. Instead, Smith started to run north on 29th Street. Crivillo gave chase. Jones passed them by in his unmarked car and attempted to block Smith's path with his vehicle. Smith evaded this attempt. Jones left his vehicle, gave chase, and eventually tackled Smith within two blocks of 29th Street and West Highland

Boulevard. At the time of his apprehension, Smith was wearing a black winter-type cap. Within minutes, both McClinton and Thompson arrived on the scene. McClinton identified the individual as the drug seller and Thompson identified him as the person he observed with McClinton.

¶ 9. It is undisputed that no one other than McClinton claimed or witnessed an actual sale of crack cocaine by Smith. Nor was any prerecorded buy money or crack cocaine found on Smith or on the chase route after a careful inspection. Furthermore, there was no testimony that Smith attempted to discard any evidence.

¶ 10. At trial, Smith testified on his own behalf. He stated that on January 31, 2000, he left his residence located at 1222 South 19th Street and took a bus to 27th Street and Kilbourn Avenue where he got off. He intended to obtain a $340 money order for his grandmother so that she could pay her rent. The corner store that he went to near the bus stop did not offer money order service, so he walked to 27th and State Streets. There, his intention was to stop in a key shop located near the intersection to obtain a key for the room in which he was residing. The key shop, however, was not open. With that, he began to walk west on the north side of West State Street. As he turned the corner north on North 29th Street, he encountered an individual who turned out to be Crivillo.

¶ 11. The essence of his testimony was that he was not the person who sold crack cocaine to McClinton, nor did he receive any money from her. He claimed that when Crivillo asked him to stop, he did not realize he was a police officer; nonetheless, he said he fled because his parole officer prohibited him from having any police contacts.

¶ 12. During closing argument, the State proposed the following to the jury:

> See, this argument — While defense attorneys try and say, well, we're not saying the police are lying; what else are they saying? There's no other reasonable explanation, and it kind of frustrates me knowing and working in this field and knowing these officers; and you know them now too. You know them. They work hard. They do a tough job. They come in here to testify a lot of times. They work long, long hours. You weigh their testimony against the defendant's.

¶ 13. The jury found Smith guilty of the charge. The trial court sentenced him to ten years in the Wisconsin state prison system, six years of initial confinement, with extended supervision for four years. In a postconviction motion, Smith moved for a new trial on the basis that his trial counsel was ineffective for failing to object to the State's improper closing argument. The motion was denied without a hearing and Smith now appeals.

## II. ANALYSIS

■

¶ 14. Smith claims his trial counsel was prejudicially ineffective for failing to object to the State's improper closing argument or request a mistrial on that basis. He contends the closing argument presented facts not in evidence and improperly bolstered the credibility of the State's witnesses.

■ ■

¶ 15. The analytical framework that must be employed in assessing the merits of a defendant's claim of ineffective assistance of counsel is well known. To sustain a claim of ineffective assistance of counsel, a

defendant must show both that counsel's performance was deficient and that counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996). A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. *Strickland*, 466 U.S. at 697. The trial court denied Smith's claim without conducting a *Machner*[3] hearing to address the deficiency issue. Thus, for the purposes of this appeal, we address only the "prejudice" prong.

¶ 16. With respect to the "prejudice" component of the test for ineffective assistance of counsel, the defendant must affirmatively prove that the alleged defect in counsel's performance actually had an adverse effect on the defense. *Strickland*, 466 U.S. at 693. The defendant cannot meet his burden by merely showing that the error had some conceivable effect on the outcome. Rather, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding[s] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 17. In *Strickland*, although the Supreme Court wrote in terms of the defendant's demonstrating that " 'but for counsel's unprofessional errors the result of the proceeding would have been different,' " it nevertheless rejected an " 'outcome determinative standard[.]' " *State v. Pitsch*, 124 Wis. 2d 628, 642, 369

---

[3] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

N.W.2d 711 (1985) (quoting *Strickland*, 466 U.S. at 693–94). Instead, the "focus is on the reliability of the proceedings." *Id.*

> "An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable . . . . The result of a proceeding can be rendered unreliable, and hence the proceeding itself, unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."

*Id.* (quoting *Strickland,* 466 U.S. at 694).

¶ 18. The *Strickland* Court further explained that the principles enunciated did not establish mechanical rules. Rather, they merely

> "guide the process of decision [and] the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."

*Pitsch*, 124 Wis. 2d at 642 (quoting *Strickland*, 466 U.S. at 696).

¶ 19. In the case before us, because of certain evidentiary deficiencies and inconsistencies, the pendulum of fairness hung in equipoise. From a review of the trial record, viewing the evidentiary problems that beset the State, we note that despite the four officers acting as a team, there was no corroborative evidence that a transaction took place. The closest evidence corroborating that a transaction took place was Thompson's observation that McClinton and Smith were walking together side-by-side. McClinton de-

scribed the mechanics of the alleged exchange between herself and Smith as "hand-to hand" lasting only a few seconds. McClinton testified that she paid for the crack cocaine with a prerecorded $20 bill. The bill was not found on Smith's person nor was it found on or near the path of pursuit. There was no evidence offered as to the recorded numbers on the bill. McClinton's testimony as to the amount of crack cocaine she purchased was inconsistent; i.e., at the preliminary hearing she claimed she purchased one rock, whereas at trial, she claimed she purchased two rocks. McClinton also admitted that her description of the color of the pants worn by the seller "possibly" was wrong. McClinton's testimony as to where Smith was located when he began to run was inconsistent, ranging from the middle of the 2700 block to somewhere in the 2800 block. In contrast, Jones and Crivillo stated that Smith did not begin to run until he started walking north on 29th Street. There was no testimony that Smith discarded any objects while he was walking west on State Street or after the pursuit began. Once Smith was apprehended, he was searched and no drug-related materials were discovered. As a result, the police retraced the pursuit path to determine if Smith had discarded any evidence. No relevant evidentiary items were found.

¶ 20.　Reviewing the evidence from Smith's standpoint, we initially note that when he was stopped, he had $340 in his right pocket and $3 in his left pocket. He also had one-half of an old $20 bill, which the arresting officers returned to him. The $340 was given to him by his grandmother to purchase a money order for the payment of her rent. Whether he was to obtain a money order for $340 or less because of the cost of purchasing the money order is unclear. His grandmother, Letie Quinn, testified that she gave him an

149

additional $3 for the cost of the money order. He, however, claimed it was for the purchase of a key for his residence. He testified he stopped at a key shop at 27th and State Streets but it was closed, so he started to walk west on State Street.

¶ 21. Smith denied that he met McClinton or sold her any crack cocaine. Yet, in her initial report, she noted the distinct abundance of freckles on his face. At no time from the point of initial contact to arrest was Smith ever out of the sight of one of the members of the undercover team. Of significance to the State's case was Smith's explanation of why he started to flee. Upon coming into contact with Crivillo on 29th Street, he claimed he did not know that Crivillo was a police officer—yet, he started to run. Under cross-examination he explained that he ran because he was instructed by his parole officer that he should not have any police contacts. This inconsistency was never resolved.

¶ 22. These evidentiary circumstances are significant because they demonstrate how close the credibility call was in this case for the jury. Credibility hung in the balance. The slightest wisp of influence could have directed the course of the jury's determination. Having set forth the circumstances, we now analyze Smith's contention that the State's closing argument tipped the balance and resulted in injustice.

¶ 23. The line between permissible and impermissible final argument is not easy to follow and is charted by the peculiar circumstances of each trial. Whether the prosecutor's conduct during closing argument affected the fairness of the trial is determined by viewing the statements in the context of the total trial. *State v. Wolff*, 171 Wis. 2d 161, 167–68, 491 N.W.2d 498 (Ct. App. 1992). The line of demarcation to which we refer

"is thus drawn where the prosecutor goes beyond reasoning from the evidence to a conclusion of guilt and instead suggests that the jury arrive at a verdict by considering factors other than the evidence." *State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979). "Argument on matters not in evidence is improper." *State v. Albright*, 98 Wis. 2d 663, 676, 298 N.W.2d 196 (Ct. App. 1980).

▮

¶ 24. In close cases, a prosecutor must be sensitive to the evidentiary hand that he or she has been dealt. When arguing by inference, special care must be taken that there exists an evidentiary basis, however slight, for the logical conclusion he or she suggests in the closing argument. Artful subtleties, ill-cast and expressed, may be occasion for error. A prosecutor's interest as a representative of the state is "not [to] win a case, but [to see] that justice shall be done." *Viereck v. United States*, 318 U.S. 236, 248 (1943).

▮

¶ 25. In this close case of evaluating credibility, we cannot ignore the prosecutor's self-imposed frustration at his own proposed suggestion that testifying police officers may have lied. This argument was made not in rebuttal, but in the State's opening final argument. There is, however, no basis in the record to assume the suggestion that any police witness lied. Nor is there any evidentiary basis to claim such an argument was invited. Smith's defense was mistaken identity, lack of physical evidence, and failure to meet the burden of proof. Once the prosecutor's rhetorical straw man was created, however, it had to be eliminated. How did the prosecutor accomplish that? With the challenged closing argument: "[I know] these officers; and

you know them now too. You know them. They work hard. They do a tough job. They come in here to testify a lot of times. They work long, long hours. You weigh their testimony against the defendant's."

¶ 26. It is undisputed that there is no evidentiary basis for the officers' work habits or job demands, or the basis for the prosecutor's *knowledge* of them. This portion of the prosecutor's closing argument unfairly referenced matters not in the record and vouched for the credibility of the police witnesses. In the context of the total trial, we conclude that the quoted portion of the prosecutor's final argument placed the reliability of the proceedings in doubt to the extent that the fairness of the trial has been jeopardized. We conclude that Smith was prejudiced. Because the trial court did not conduct an evidentiary hearing to address the alleged deficiency of trial counsel for failure to object to the final argument or move for a mistrial, we remand for an evidentiary hearing for this determination.

*By the Court.*—Order reversed and cause remanded for further proceedings.