BRASH, J.
¶1 Rondale Darmon Tenner appeals his judgment of conviction entered on a jury verdict finding him guilty of first-degree reckless homicide while using a dangerous weapon, armed robbery, and possession of a firearm by a felon. He also appeals an order of the circuit court denying his postconviction motion.
¶2 Tenner argues that he received ineffective assistance from his trial counsel because counsel failed to impeach one of the State's witnesses-Tenner's former girlfriend-with her prior criminal convictions. Tenner further argues that he is entitled to a new trial based on newly-discovered evidence: an affidavit by an inmate stating that one of the witnesses to the shooting had allegedly confessed to committing the homicide himself.
¶3 After an evidentiary hearing on Tenner's postconviction motion, the circuit court rejected Tenner's claim of ineffective assistance of counsel, finding that trial counsel had made a reasonable strategic decision in not impeaching Tenner's former girlfriend. The court also concluded that the inmate who said he heard the witness's confession was not credible. The court therefore denied Tenner's motion. We affirm.
BACKGROUND
¶4 The charges against Tenner stem from a drug deal that turned into an armed robbery and homicide. On February 14, 2013, Milwaukee police officers were dispatched to a residence on North 2nd Street in Milwaukee to investigate a shooting. They found the victim, Hank Hagen, lying on the floor with a gunshot wound to his back. Hagen was pronounced dead at the scene.
¶5 As part of their investigation, detectives spoke with D.J., who lived at the residence. D.J. stated that he had received a phone call from "Rock," later identified as Tenner, who wanted to purchase marijuana. Tenner made the purchase from D.J., but called D.J. again a short time later wanting to purchase a larger amount of marijuana. D.J. then called Hagen, from whom he regularly purchased marijuana, to arrange the transaction. A short time later both Tenner and Hagen arrived at D.J.'s residence, where D.J. took them to the basement to complete the drug sale. D.J.'s girlfriend, A.M., was also present.
¶6 Tenner reached into his jacket on the pretense of retrieving money to purchase the marijuana, but instead he pulled out a semi-automatic handgun and ordered everyone to "get on the floor." D.J. heard Tenner say to Hagen that he was "moving too much," and then saw Tenner shoot Hagen in the back before running up the stairs. Additionally, Tenner took all of D.J.'s money-$ 250-along with the marijuana and A.M.'s cell phone.
¶7 Police identified Tenner from the cell phone number he had used to call D.J. A photo array was shown to D.J., who positively identified Tenner. Tenner was arrested. Subsequently, a line-up was shown to A.M., who also positively identified Tenner.
¶8 The matter proceeded to a jury trial in September 2014.[1] D.J. testified as to the details of the robbery and the shooting. D.J. also testified regarding the first drug deal he transacted with Tenner earlier that day. A.M. testified as well with a similar description of the events of that day.
¶9 Hagen's step-cousin, Gilbert Perry, also testified. He had driven Hagen to D.J.'s residence and waited for him outside. He testified that he heard a "thump" and then observed someone flee from the residence, although he could not identify that person. Perry stated that the person left in a gold-colored four-door compact car. D.J.'s neighbor also testified that Tenner was the man she saw leave D.J.'s house earlier that day-several hours before the shooting, consistent with the time of the first drug transaction-and get into a tan four-door car.
¶10 Misty Beilke, a woman Tenner was dating at the time of the shooting, testified as well. According to Beilke, Tenner had been at her residence on the morning of February 14, 2013, and had left in her gold Ford Focus. She testified that he then returned to her residence later in the afternoon, that he "seemed a little nervous," and that he took a shower and shaved his sideburns off. The next day Tenner was again at Beilke's residence when the police arrived. She stated that he hid his coat in a laundry basket, which seemed strange, and told her not to open the door. The police subsequently recovered the jacket, which D.J. identified as the one the shooter had worn.
¶11 The jury convicted Tenner of first-degree reckless homicide while using a dangerous weapon, armed robbery, and possession of a firearm by a felon. He was sentenced in October 2014 to a fifty-eight year term, bifurcated as thirty-five years of initial confinement and twenty-three years of extended supervision.
¶12 Tenner filed a postconviction motion in June 2017. He argued that his trial counsel was ineffective for failing to impeach Beilke regarding her eight prior criminal convictions, referring to her as a "key" witness for the State. Tenner further asserted that he had obtained newly discovered evidence: an affidavit from Ivan Boyd, who claimed that D.J. had confessed to him that D.J. had shot Hagen. This alleged confession had occurred while D.J. and Boyd were incarcerated together.[2] Boyd submitted his affidavit in February 2017.
¶13 An evidentiary hearing on Tenner's postconviction motion was held over several dates in January, March, April, and June 2018.[3] Testimony was taken from several people including Tenner's trial counsel, Charles Glynn, regarding the ineffective assistance of counsel claim for failing to impeach Beilke, and Boyd, who submitted the affidavit regarding D.J.'s alleged confession and testified in support of Tenner's newly discovered evidence claim.
¶14 Glynn testified that his reason for not impeaching Beilke was based on trial strategy. First, he felt that attacking Beilke's character regarding her prior criminal convictions would reflect poorly on Tenner since they were dating at the time. The State had already elicited testimony that she was an exotic dancer, which may have diminished her credibility with the jury. Glynn further explained that he felt that Beilke's testimony had not "hurt" the defense, and actually may have "helped" Tenner: she had testified at trial that Tenner stood right behind her when the police came to her door instead of trying to run or hide, and that his shaving and showering when he had returned to her apartment after the shooting were normal daily actions.
¶15 Boyd testified that D.J. had confessed to the shooting while they were in the "bullpen" at the Police Administration Building shortly after the shooting. Boyd stated that D.J. had told him he had "shot [his] friend" over the money from the drug transaction. Boyd claimed that he remembered the confession after he met Tenner at Dodge Correctional Institution and they discussed the reason that Tenner was incarcerated.
¶16 On cross-examination, Boyd admitted to submitting a false affidavit for a different case in federal court. Boyd also admitted to sending a letter to a different trial court in support of a defendant in a different case, representing that he was with Nations of Fire Ministry in Chandler, Arizona, when he was in fact incarcerated in Wisconsin.
¶17 At the conclusion of the evidentiary hearing, the postconviction court denied Tenner's motion. With regard to Glynn's testimony, the court found him "credible and worthy of belief." The court concluded that Glynn's decision not to impeach Beilke after assessing her testimony was a reasonable trial tactic. Therefore, the court found that Glynn's performance was not deficient under the ineffective assistance of counsel standard.
¶18 With regard to Boyd's testimony, the postconviction court found him completely incredible, noting that he was a "pure hustler" and that the court "didn't believe a word that he had to say." The postconviction court held that Tenner had not demonstrated a reasonable probability that if a jury heard the newly discovered evidence, it would have had a reasonable doubt as to Tenner's guilt.
¶19 This appeal follows.
DISCUSSION
I. Ineffective Assistance of Counsel Claim
¶20 Tenner maintains that he received ineffective assistance from Glynn due to his choice to refrain from impeaching Beilke about her prior criminal convictions. "Wisconsin applies the two-part test described in Strickland [v. Washington , 466 U.S. 668 (1984) ] for evaluating claims of ineffective assistance of counsel." State v. Roberson , 2006 WI 80, ¶28, 292 Wis. 2d 280, 717 N.W.2d 111. That test requires that a defendant show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense. Strickland , 466 U.S. at 687. "A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one." State v. Smith , 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.
¶21 Our standard of review for ineffective assistance of counsel claims presents "a mixed question of law and fact." State v. Johnson , 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). The findings of fact made by the circuit court, " 'the underlying findings of what happened,' will not be overturned unless clearly erroneous." Id. (citation omitted). However, "[t]he ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." Id. at 128.
¶22 "To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness." State v. Love , 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62. For this assessment, we must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." State v. Carter , 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (quoting Strickland , 466 U.S. at 689 ; ellipses in Carter .)
¶23 There is a "strong presumption" that counsel's conduct "falls within the wide range of reasonable professional assistance." Id. (citation omitted). Furthermore, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference." State v. Balliette , 2011 WI 79, ¶26, 336 Wis. 2d 358, 805 N.W.2d 334. In fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. (quoting Strickland , 466 U.S. at 690 ). Even if a decision of counsel is "made with less than a thorough investigation," it "may be sustained if reasonable, given the strong presumption of effective assistance and deference to strategic decisions." Balliette , 336 Wis. 2d 358, ¶26.
¶24 At the evidentiary hearing on Tenner's postconviction motion, Glynn stated that his reason for not impeaching Beilke on her prior criminal convictions was based on trial strategy; it would reflect poorly on Tenner's character for dating someone with a criminal history, and she had provided some testimony that was helpful to Tenner, so he did not want to "hurt" her. Therefore, he made the strategic decision not to impeach Beilke.
¶25 The postconviction court found this strategy to be reasonable. The court took note of Glynn's testimony that he had assessed Beilke's testimony and the jury's reaction to it, and after discussing it with Tenner, decided not to impeach her. The court further observed that Glynn was an experienced criminal defense attorney who had cross-examined hundreds of State witnesses in his career, and that trial lawyers have to make decisions of that sort "on the fly" all the time.
¶26 We agree that Glynn's strategic decision was reasonable. We therefore affirm the postconviction court's holding that Glynn was not deficient in his representation of Tenner.[4] See Balliette , 336 Wis. 2d 358, ¶26.
II. Newly Discovered Evidence Claim
¶27 Tenner also reiterates his argument that Boyd's affidavit and testimony are newly discovered evidence that mandate a new trial. "The decision to grant or deny a motion for a new trial based on newly[ ]discovered evidence is committed to the circuit court's discretion." State v. Plude , 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42. "A circuit court erroneously exercises its discretion when it applies an incorrect legal standard to newly[ ]discovered evidence." Id.
¶28 In order to warrant a new trial, newly discovered evidence must meet the following criteria: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." Id. , ¶32 (quoting State v. McCallum , 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997) ). "If the defendant proves these four criteria by clear and convincing evidence, the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." McCallum , 208 Wis. 2d at 473.
¶29 Additionally, if the newly discovered evidence is a recantation by a witness, that recantation "must be corroborated by other newly discovered evidence." Id. at 473-74. "Corroboration is required because recantation is inherently unreliable; the recanting witness is admitting he or she lied under oath. Either the original testimony or the recantation is false." State v. McAlister , 2018 WI 34, ¶56, 380 Wis. 2d 684, 911 N.W.2d 77 (citation omitted). "Corroboration requires newly discovered evidence of both: (1) a feasible motive for the initial false statement; and (2) circumstantial guarantees of the trustworthiness of the recantation."Id. , ¶58.
¶30 In McAlister , a recent decision of the Wisconsin Supreme Court, the court drew a parallel between recantation and affidavits that "use what is claimed to be [the witnesses'] own words to allege they lied at trial." Id. , ¶55. For that decision, the court analyzed a case factually similar to Tenner's: a defendant sought a new trial based on newly discovered evidence consisting of affidavits by three men stating that two witnesses who had testified against the defendant had admitted to the three men that they intended to falsely accuse the defendant. Id. , ¶20. Our supreme court determined that similar to recantation, such affidavits are also inherently unreliable and thus required corroboration. Id. , ¶56.
¶31 In this case, the postconviction court stated that the parties "largely suggest" that the four Plude criteria were met here.[5] It also extensively cited McAlister regarding the corroboration requirement. However, it ultimately determined that Tenner's claim failed because he had not demonstrated that there was a reasonable probability that a different result would be reached in a new trial with the inclusion of Boyd's affidavit. See McCallum , 208 Wis. 2d at 473.
¶32 However, we conclude that our supreme court's directive in McAlister relating to the application of corroboration requirements to an affidavit such as Boyd's should be applied here. With that being said, the record shows that the postconviction court's findings support a conclusion that neither of the requirements for corroboration-newly discovered evidence of a feasible motive for the initial false statement and circumstantial guarantees of the trustworthiness of the recantation-were met. See McAlister , 380 Wis. 2d 684, ¶58. The court pointed out that the "feasible motive" for D.J. to lie about the shooting-"to get away with it, to get away with the killing, to get away with the money"-was "consistent" throughout the case and therefore not newly discovered. Furthermore, although the court noted that there was evidence that Boyd could have been in proximity to D.J. at the time he claimed to have heard D.J.'s confession, the court found Boyd's testimony to be wholly incredible. In fact, the court declared that the reason there was not a reasonable probability of a different result at a new trial was because Boyd was not credible.
¶33 Although the postconviction court did not specifically apply the additional corroboration requirements set forth in McAlister to its findings, it correctly applied the standard for newly discovered evidence set forth in Plude and McCallum when it determined that even with the Plude requirements met, there was not a reasonable probability that a different result would be reached in a new trial. See Plude , 310 Wis. 2d 28, ¶32 ; McCallum , 208 Wis. 2d at 473. Therefore, it did not erroneously exercise its discretion in rejecting Tenner's newly discovered evidence claim.
¶34 Accordingly, we affirm Tenner's judgment of conviction and the denial of his postconviction motion.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

This case was first tried in October 2013; it was continued into November after trial counsel was unable to proceed due to a family emergency. That trial resulted in a mistrial due to a hung jury. The case was then re-tried in September 2014. Both trials were before the Honorable Stephanie Rothstein.

D.J. was arrested after the shooting and charged with keeping a drug house. The charge was dismissed after D.J. successfully completed a deferred prosecution agreement and agreed to testify against Tenner.

Tenner's postconviction motion was heard by the Honorable Mark A. Sanders.

The postconviction court did not reach the prejudice prong of the Strickland test because it held that Tenner had not satisfied the deficient performance prong. See Strickland v. Washington , 466 U.S. 668, 697 (1984). For that reason, we will not discuss the prejudice prong, except to state that with the extensive evidence against Tenner, he has not established that he was prejudiced by his trial counsel's choice not to impeach Beilke. See State v. Love , 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62 ("To prove constitutional prejudice, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ") (citation and one set of quotation marks omitted).

On appeal, the State argues that the fourth Plude criterion was not met, in that Boyd's affidavit was cumulative regarding the fully tried issue of D.J.'s credibility. See State v. Plude , 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42. Because we affirm the postconviction court's determination on this issue, we do not address this argument.