**COURT OF APPEALS
DECISION
DATED AND FILED**

**October 12, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.   2020AP2119-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CF4698

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

     PLAINTIFF-RESPONDENT,

   V.

LARRY L. JACKSON,

     DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Larry L. Jackson appeals his judgment of conviction for first-degree intentional homicide, as a party to a crime with the use of a deadly

weapon, and for possession of a firearm by a felon. He also appeals the trial court's order denying his postconviction motion.

¶2 Jackson argues that his trial counsel was ineffective for failing to investigate potential alibi witnesses, for failing to prepare a witness called at trial, and by erroneously advising Jackson that he would have to testify before the other defense witnesses. The trial court denied his postconviction motion without a hearing, finding that Jackson's allegations regarding counsel's deficient performance were conclusory, and further, that he failed to establish prejudice. Upon review, we affirm.

## BACKGROUND

¶3 The charges against Jackson stem from the shooting death of Richard King in March 2015. Officers from the Milwaukee Police Department responded to a call regarding the shooting that had occurred in front of a duplex on North 60th Street, and found King with gunshot wounds to his left flank and right chest area. King died from those injuries.

¶4 According to the complaint, King had been arguing with his neighbor, Gerald Tucker, who also lived in the duplex. Tucker told police that because of the argument, his wife had called Jackson, a friend of Tucker's, who then came to the duplex. A witness to the incident and a friend of King's, Andre Dorsey, said that shortly after Jackson arrived, Jackson and Tucker walked in the front door of the duplex. Dorsey then heard "a couple gunshots" that came from the front door area, and saw King fall to the ground. Dorsey later identified Jackson from a photo array.

¶5 Tucker told police that after he and Jackson walked in the front door, Jackson pulled out a black and silver semi-automatic handgun. Tucker stated that

he "held out his hand for the gun" to try to prevent the shooting, but that Jackson opened the door, "said something to [King] like, 'What's up?'" and then shot "at least 8 times."

¶6 Jackson was initially charged with first-degree reckless homicide in King's death, but that charge was subsequently amended to first-degree intentional homicide. The matter proceeded to trial at the end of October 2016. Witnesses for the State included Dorsey, who testified that the shots that killed King came from inside the door of the duplex just after Jackson and Tucker entered; Tucker, who testified that Jackson was the shooter; and the mother of King's children, Charity Witmer, who lived in the duplex with King. Witmer testified that on the day King was shot, she saw a man run past her window after she heard the gunshots, and then a few weeks later saw a man with Tucker's wife in the hallway of the duplex who she believed was the same one who had run past her window after King was shot. Witmer was not able to positively identify Jackson in a photo array, but she chose two photos that were possibly the man she saw, one of which was Jackson.

¶7 The State also called Joe Brown, whose nephew is Jackson's friend. Brown testified that on the day of the shooting, he had loaned Jackson his gun, a .40 caliber Smith & Wesson pistol. Brown stated that Jackson returned thirty to forty-five minutes later with the gun and changed his clothes. Brown also said that Jackson had blue rubber gloves on when he returned, and that Brown boiled the gloves in a pot of water to "[g]et all the evidence off" of them.

¶8 Brown further testified that he later noticed that some bullets were missing from the gun when Jackson returned it. When he asked Jackson about the missing bullets, he said Jackson said that he had "shot somebody" after a friend had called him to come over and told him to shoot that person. Brown stated that

Jackson referred to the friend as "Sabir," but Brown thought his name was Gerald— Tucker's first name.

¶9 Brown stated that he subsequently told police that he thought five bullets were missing from his gun. A police detective testified that they recovered five .40 caliber Smith & Wesson cartridge casings from the front of the duplex, along with a fired .40 caliber Smith & Wesson bullet, all of which were determined by a forensic firearm tool mark examiner from the State Crime Laboratory to have been fired from Brown's gun.

¶10 Prior to the trial, Jackson had filed a notice of alibi stating that at the time of the shooting, he was at the home of his mother, Carol Jackson, with his sister, Crystal Jackson, and JaNikka Marsh, his girlfriend at that time. The defense called Carol as a witness, who on direct examination testified that Jackson was at her house on the night of the shooting and had not left, which she knew because her alarm system was not triggered. Carol testified that she remembered that particular day because Jackson and Marsh had gotten into an argument, and that was the last time Marsh was at Carol's apartment. However, on cross-examination, the State elicited testimony from Carol that she told a detective who had called her about the case that she did not know where Jackson was at the time of King's shooting.

¶11 Carol also acknowledged that she had been unable to provide the police with information on how to contact Crystal—indeed, that she had no current address or telephone number for Crystal. Carol also acknowledged that she had been in frequent contact with Jackson after he was accused of King's homicide, although she stated that they did not "talk about this case very much."

¶12 After the State had rested, and prior to Carol's testimony, Jackson had indicated that he wanted to testify in his own defense. Jackson's trial counsel told the trial court that Carol would be testifying first, to which the court responded:

> THE COURT: I'm just wondering—so you've got somebody testifying before him?
>
> [DEFENSE COUNSEL]: I know the [c]ourt's aware of the logistical issues we have with him. Let me just talk to him about that, about if it would be okay if he testifies first.

After a discussion off the record, counsel informed the court that Jackson had decided not to testify. Counsel explained that Jackson had requested that counsel ask Jackson's father—who was in the courtroom—for advice. Counsel stated that Jackson's father was "absolutely clear about his advice," and that Jackson had taken that into consideration in making his decision not to testify. The court confirmed with Jackson that this explanation by counsel was accurate. Shortly thereafter, Carol testified as described above, and the defense rested.

¶13 The jury returned guilty verdicts on both the charge of first-degree intentional homicide as well as the charge of being a felon in possession of a firearm. Jackson was sentenced to life imprisonment, with eligibility for extended supervision in 2051, along with a consecutive five-year sentence for the possession of a firearm charge, bifurcated as two years of initial confinement and three years of extended supervision.

¶14 Jackson filed a postconviction motion in January 2020. He argued that he had received ineffective assistance from his trial counsel because counsel (1) failed to call his other two alibi witnesses, Crystal Jackson and JaNikka Marsh; (2) failed to interview and prepare Carol Jackson prior to calling her as a witness; and (3) incorrectly advised him by telling him that the trial court was requiring that

Jackson testify before any other defense witnesses, and he asserted that this was the reason he had decided not to testify. He averred that his testimony would have related to his alibi—that he was with Carol, Crystal, and Marsh at the time of the shooting.

¶15 The trial court rejected Jackson's claims. With regard to the failure to call Crystal and Marsh, the court found that Jackson had not sufficiently alleged a deficiency by trial counsel, but even in assuming a deficiency, Jackson had failed to prove prejudice due to the strength of the State's case. With regard to the claim about failing to prepare Carol, the court found that Jackson's allegations were conclusory because Jackson did not allege what steps counsel should have taken to prepare her. His claim that trial counsel erroneously advised him about the order of the defense witnesses was rejected because it was not supported by the record; the trial court also pointed out that Jackson had not established that he was prejudiced, again due to the strength of the State's case.

¶16 Therefore, the trial court denied Jackson's postconviction motion without a hearing. This appeal follows.

## DISCUSSION

¶17 To evaluate Jackson's claims of ineffective assistance of counsel, we apply the familiar two-prong test described in *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Roberson*, 2006 WI 80, ¶28, 292 Wis. 2d 280, 717 N.W.2d 111. To prevail on such a claim, a defendant must prove both that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. To prove deficiency, the defendant must show that trial counsel's actions or omissions were "professionally unreasonable[.]" *Id.* at 691. To prove prejudice, the defendant must show that "there is a reasonable

6

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶18 When we review a claim of ineffective assistance of counsel, we uphold the trial court's findings of fact unless they are clearly erroneous. *See State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. However, whether the facts satisfy the deficiency and prejudice components are questions of law that we review *de novo*. *See id.* The defendant "must prevail on both parts of the test to be afforded relief," *see State v. Allen*, 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433, and "[a] court need not address both components of this inquiry if the defendant does not make a sufficient showing on one," *see State v. Smith*, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

¶19 A claim of ineffective assistance of counsel requires that a postconviction evidentiary hearing be held "to preserve the testimony of trial counsel." *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). However, a defendant is not automatically entitled to an evidentiary hearing relating to his or her postconviction motion. *State v. Bentley*, 201 Wis. 2d 303, 309-10, 548 N.W.2d 50 (1996). Rather, the trial court is required to hold an evidentiary hearing only if the defendant has alleged "sufficient material facts that, if true, would entitle the defendant to relief." *Allen*, 274 Wis. 2d 568, ¶14. This is a question of law that we review *de novo*. *Id.*, ¶9.

¶20 If, on the other hand, the postconviction motion "does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the trial court, in its discretion, may either grant or deny a hearing. *Id.* We will

uphold such a discretionary decision if the trial court "has examined the relevant facts, applied the proper legal standards, and engaged in a rational decision-making process." *Bentley*, 201 Wis. 2d at 318.

¶21 Jackson's claims all revolve around the contention that his trial counsel did not properly present his alibi defense. He alleges that Carol's testimony was "crippled" by her prior statements to police, and he asserts that with better preparation on the part of trial counsel, that could have been avoided; or, in the alternative, by calling Crystal and Marsh as witnesses, the defense could have avoided calling Carol as a witness altogether. He further asserts that but for counsel's alleged erroneous information regarding the order of the defense witnesses, he would have testified and provided the same alibi information that Carol had provided in her testimony—that he was with Carol, Crystal, and Marsh when King was shot. Jackson contends that these errors resulted in cumulative prejudice that undermines the confidence in the outcome of his trial.

¶22 However, in establishing cumulative prejudice, "each alleged error must be deficient in law … in order to be included in the calculus for prejudice." *See State v. Thiel*, 2003 WI 111, ¶61, 264 Wis. 2d 571, 665 N.W.2d 305. Jackson's allegations regarding his trial counsel's failure to adequately prepare Carol prior to her testifying are conclusory, *see Allen*, 274 Wis. 2d 568, ¶9, as well as insufficient in that Jackson fails to specifically explain how counsel should have prepared her, *see id.*, ¶23 (a defendant's postconviction motion must specifically allege "the five 'w's' and one 'h'; that is, who, what, where, when, why, and how" to be factually sufficient to demonstrate he or she is entitled to relief). Thus, Jackson has not alleged sufficient facts to establish that counsel was deficient with regard to this issue.

¶23    Turning to Jackson's claim about trial counsel's failure to call his other two alibi witnesses, Crystal and Marsh, Jackson did provide affidavits from them averring to Jackson's alibi. The State argues that the record does not establish that trial counsel failed to investigate these witnesses, but rather that counsel was unable to reach them. This contention is based generally on Carol's testimony that she had no contact information for Crystal, and Marsh's affidavit averring that she never contacted trial counsel even though she "knew [Jackson] was innocent[.]" However, both Crystal and Marsh averred that they were never contacted by counsel with regard to testifying. Furthermore, Carol's testimony does not establish that counsel actually made any effort to search for these witnesses but was unable to locate them, as argued by the State.

¶24    Nevertheless, even assuming that trial counsel was deficient in failing to call Crystal and Marsh, Jackson has not established that this was a prejudicial error due to the strength of the State's case against him. In support of his argument, Jackson contends that the State's witnesses all had "issues affecting their credibility." This contention primarily points to Tucker—who was initially charged with King's homicide and gave several statements to police in which he denied knowing who shot King—and Brown, who was charged by the State as a felon in possession of a firearm and by the federal government under the Armed Career Criminal Act as a result of this incident. Brown entered into a plea agreement where the charge by the State was dismissed, and the federal charge was amended with an agreement to recommend a reduced sentence. This plea agreement required Brown to cooperate with related investigations and to testify truthfully at subsequent trials and proceedings.

¶25    However, the jury heard all of this information during Tucker's and Brown's testimony. Additionally, the State called Anthony Boone, who was at

Brown's apartment on the night of the shooting and corroborated Brown's testimony that Jackson came to Brown's apartment that night and changed his clothes in the bathroom. It is the responsibility of the jury to determine the credibility of the witnesses and the weight that is afforded the evidence. *State v. Poellinger*, 153 Wis. 2d 493, 504, 451 N.W.2d 752 (1990). Indeed, "[i]t is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 506.

¶26 Furthermore, generally errors by counsel, "even unreasonable errors, will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial, especially if the evidence against the defendant remains compelling." *Thiel*, 264 Wis. 2d 571, ¶61. Here, in addition to the testimony of Tucker and Brown, which points to Jackson as the shooter, the State provided ballistics evidence regarding Brown's gun and the bullet and casings that were recovered at the scene, as well as other corroborating identification evidence such as the testimony of Dorsey and Witmer, who both placed Jackson at the scene of the shooting, and Boone, who placed Jackson at Brown's apartment after the shooting.

¶27 Put another way, to establish prejudice there must be "a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation omitted). Jackson has not established the substantial likelihood of a different result if the jury had heard the testimony of Crystal and Marsh, given the compelling nature of the State's case.

¶28 We reach a similar conclusion regarding Jackson's claim that trial counsel allegedly provided him with erroneous information relating to the order of the defense witnesses, which resulted in his deciding not to testify. Jackson

submitted an affidavit from his father, averring that during the consultation with counsel when Jackson decided not to testify, he heard counsel tell Jackson that the trial court was requiring that Jackson testify first. Jackson argues that his father's advising him not to testify was based on that erroneous information.

¶29 In the first place, although Carol was impeached with conflicting information regarding her statements to police, she provided testimony regarding Jackson's alibi; Jackson does not allege that his testimony would have provided any different or additional information relating to his alibi. Furthermore, even if we assume that trial counsel was deficient by providing erroneous information regarding the order of the defense witnesses, Jackson has not established he was prejudiced—that there is a substantial likelihood of a different result absent that alleged error—due to the strength of the State's case. *See id.*

¶30 Therefore, the trial court did not err in denying his postconviction motion without a hearing. *See Allen*, 274 Wis. 2d 568, ¶9. Accordingly, we affirm his judgment of conviction, as well as the order of the trial court denying his postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).