COURT OF APPEALS
DECISION
DATED AND FILED

September 7, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP224-CR**

Cir. Ct. No. 2018CF501

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JASON H. LAVIGNE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jason LaVigne appeals a judgment convicting him of one count of repeated sexual assault of the same child and an order denying his

motion for postconviction relief. LaVigne argues that he should be granted a new trial because he received ineffective assistance of trial counsel; because a witness changed her testimony after trial; because he discovered new evidence after trial; and because the circuit court erroneously exercised its discretion by not dismissing a juror for bias, by allowing the State to amend the Information at trial, by not striking a witness's testimony, and by admitting other-acts evidence. We reject LaVigne's arguments and affirm.

## BACKGROUND

¶2      LaVigne was a teacher at Little Chute High School for twenty years, starting in the 1990s and continuing until the summer of 2018 when he resigned. In 2009, Lyla[1] reported to a school official that she had a keyboarding class with LaVigne her "freshman year from late January to late March of 1999" and that LaVigne used to "rub his erect penis on [her] back" while she was typing on her computer in the back row of the classroom. Lyla recalled "seeing a distinct bump in his pants" and said "[i]t was quite noticeable that he was erect." Lyla felt compelled to report the incident after ten years, in part, because her younger sister was attending Little Chute High School at the time. The report was later closed "without any substantial findings" and placed in LaVigne's personnel file. Law enforcement was never notified.

¶3      In June of 2018, LaVigne was accused of sexually assaulting Zoey, his daughter's sixteen-year-old friend, on LaVigne's pontoon boat in Marinette

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use pseudonyms instead of the victims' names. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

County. While investigating Zoey's allegations, law enforcement discovered Lyla's 2009 report in LaVigne's personnel file. Based on Lyla's report, the State subsequently charged LaVigne in this case with one count of repeated sexual assault of a child. LaVigne was also charged in Marinette County with one count of third-degree sexual assault based on Zoey's allegations.

¶4 Prior to trial in this case, the circuit court granted the State's motion to admit other-acts evidence involving Zoey's allegations from Marinette County and allegations by Natasha, another friend of LaVigne's daughter. Natasha had reported that LaVigne rubbed her shoulder while giving her a ride home late at night in August 2017 and then, upon arriving at her home, put his arms around her and attempted to kiss her. The court permitted the State to present the other-acts evidence for purposes of demonstrating LaVigne's motive, method of operation, absence of mistake, and the context of the case. The State, however, was not permitted to present evidence of Zoey's allegations of sexual intercourse; it could only present evidence that LaVigne had touched Zoey's breasts and vagina and that his DNA was found on Zoey's left breast.

¶5 At trial, several witnesses testified in support of the State's case, including Lyla, Bryan Collar (a friend and classmate of Lyla), Officer Brandon Stahmann (the investigating officer), Natasha and Zoey. Lyla described how LaVigne would sometimes stop behind her in class, rub her neck and her side with his hands, and rub his erect penis on her back. Lyla also recounted how LaVigne once asked her to come to his classroom during the lunch hour. Lyla was afraid to go alone, so she asked Collar to go with her. LaVigne asked Collar to wait in the hallway and then asked Lyla to read a note on a computer screen, which said, "I'm sorry. Don't tell anyone about this. It won't happen again." Collar testified that he recalled going to LaVigne's classroom with Lyla, who seemed nervous at the

time, and that Lyla told him about "a note or a computer or something" upon exiting the room, but he could not remember what it said.

¶6    During Lyla's cross-examination, LaVigne's trial counsel established that Lyla would have been in eighth grade at the beginning of 1999—the time period charged in the Information—and that Lyla did not have LaVigne's keyboarding class until the first three months of 2000, which was Lyla's freshman year of high school. Over LaVigne's objection, the circuit court allowed the State to amend the Information to reflect that the offense occurred at the beginning of 2000, not 1999.

¶7    LaVigne adjusted his defense to the amended Information accordingly, and he presented evidence that he took paternity leave "[f]or a large chunk" of the time when Lyla was a student in his keyboarding class. LaVigne also attempted to show, using a chair similar to that in which Lyla might have sat as demonstrative evidence, that it would have been impossible for him to rub his penis on Lyla's back because the chairs in his keyboarding class were too tall. Testifying in his own defense, LaVigne denied touching Lyla with his penis or walking around the classroom with an erection.

¶8    In addition, LaVigne testified to his version of events regarding the other-acts evidence involving Natasha and Zoey. According to LaVigne, he did not rub Natasha's shoulder or put his arms around her, but he did make a joke about kissing her that "went over her head" and that she "misunderstood." LaVigne also described how Zoey was the initial aggressor on his pontoon boat and that he fell asleep on the boat and woke up to Zoey on his lap, kissing him, and "trying to get [him] to do things with her that were inappropriate." LaVigne testified that he pushed Zoey away and yelled at her to stop.

4

¶9 The jury found LaVigne guilty. Thereafter, the circuit court sentenced LaVigne to five years' initial confinement followed by eleven years' extended supervision. LaVigne was also later convicted in Marinette County for his sexual assault of Zoey.

¶10 LaVigne subsequently filed a postconviction motion seeking a new trial in this case. In support, he argued that his trial counsel was ineffective, that Natasha had changed her testimony in the later-tried Marinette County case, that he had discovered new evidence regarding the height of the chairs in his keyboarding classroom, and that the circuit court erroneously exercised its discretion several times throughout this case. In a written decision, the court concluded that LaVigne was entitled to a **Machner**[2] hearing on his ineffective assistance of counsel claims, but the court denied relief on the remainder of the claims without a hearing. Following the **Machner** hearing—at which LaVigne, his trial counsel, and his wife and daughter all testified—the court issued a written decision denying LaVigne's ineffective assistance of counsel claims.

¶11 LaVigne now appeals, renewing each of the claims in his postconviction motion. Additional facts will be provided as necessary below.

## DISCUSSION

### I. Ineffective assistance of counsel

¶12 A criminal defendant has the constitutional right to effective assistance of counsel. **State v. Sholar**, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912

---

[2] **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

5

N.W.2d 89. To prevail on an ineffective assistance of counsel claim, the defendant bears the burden of proving: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. ***Id.*** A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. ***State v. Smith***, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

¶13 To establish deficient performance, a defendant must demonstrate that his or her trial counsel's performance fell below "an objective standard of reasonableness." ***State v. Savage***, 2020 WI 93, ¶28, 395 Wis. 2d 1, 951 N.W.2d 838 (citation omitted). "Courts afford great deference to trial counsel's conduct, presuming that it 'falls within the wide range of reasonable professional assistance.'" ***Id.*** (citation omitted). "Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." ***State v. Thiel***, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305.

¶14 To establish prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." ***Savage***, 395 Wis. 2d 1, ¶32 (quoting ***Strickland v. Washington***, 466 U.S. 668, 694 (1984)). A reasonable probability is a probability sufficient to undermine confidence in the outcome. ***Strickland***, 466 U.S. at 694. However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." ***Sholar***, 381 Wis. 2d 560, ¶44 (citing ***Strickland***, 466 U.S. at 693).

¶15 Whether a defendant has been denied the effective assistance of counsel is a mixed question of law and fact. ***Savage***, 395 Wis. 2d 1, ¶25. We will not overturn a circuit court's findings of fact, including findings regarding the

factual circumstances of the case and trial counsel's conduct and strategy, unless those findings are clearly erroneous. *Id.* We review de novo whether counsel performed deficiently and, if so, whether counsel's deficient performance was prejudicial to the defense. *Id.*

A. *Counsel's decision not to provide LaVigne with a recorded jail phone call involving other-acts evidence*

¶16 At trial, LaVigne testified about his recollection of the other-acts incident involving Zoey. LaVigne explained how his daughter was sleeping on the boat but apparently woke up during the incident. The State questioned LaVigne regarding a telephone conversation between him and his daughter while LaVigne was in jail. Specifically, the State asked whether LaVigne recalled his daughter asking him about what she should tell police about the incident involving Zoey and whether he recalled "instructing and directing [her] on the story that she is to tell police." LaVigne responded multiple times that he did not communicate with his daughter about the incident between his arrest and her speaking to police about the incident. Upon further questioning, LaVigne confidently stated: "I did not speak to my daughter before she was interviewed. Prove that please."

¶17 Subsequently, over LaVigne's objection, the State presented a recorded jail phone conversation between LaVigne and his daughter that occurred prior to LaVigne's daughter speaking to police. Upon being confronted with the recording, LaVigne clarified that he had spoken to his daughter in that time frame but did not instruct her what to tell police. According to LaVigne, he had simply told his daughter to tell the same story she had previously told him.

¶18 LaVigne argues that his counsel performed deficiently because counsel did not review or provide him with the recording of the phone call

between him and his daughter. He concedes that "[t]he jail call did involve a collateral issue," but he contends that his credibility was the "central issue" in the trial and that his credibility was severely undercut by counsel failing to give him the recording.

¶19 The circuit court concluded, and we agree, that counsel's failure to provide LaVigne with the recording of his phone call did not fall below an objective standard of reasonableness. At the *Machner* hearing, counsel testified that, before trial, he had heard the recording of the phone call and reviewed the transcript of the recording. Counsel also testified, however, that he did not prepare LaVigne for cross-examination on the recording because the recording was about the Marinette County case and because he did not anticipate that it would be admitted into evidence. Indeed, the court recognized in its decision on LaVigne's postconviction motion that "[b]ased on the scope of pretrial hearings and rulings, the jail call was not likely to be relevant in the Outagamie County case unless someone unexpectedly opened the door." Counsel could therefore reasonably conclude that LaVigne did not need to be prepared for cross-examination on the recorded jail phone call.

¶20 LaVigne disagrees with the circuit court's suggestion that he had opened the door to the introduction of the recording, arguing that "[t]he State opened the door by asking the question." LaVigne fails to recognize, however, that had he admitted speaking to his daughter on the phone before she spoke to police and had he not challenged the prosecutor to "[p]rove that" he had spoken to his daughter, the recording likely would not have been admitted into evidence. We surmise this likelihood based on the court's assessment of the pretrial rulings, which LaVigne does not question. Although LaVigne emphasizes his later testimony that he had made many phone calls to his family while in jail and that he

did not recall speaking to his daughter at the particular time in question, the court never credited his testimony. Indeed, LaVigne's claimed uncertainty could be viewed as incredible because he never expressed such uncertainty in his trial testimony. Furthermore, the court observed that LaVigne "was a party to the jail call and should have been fully aware of what he said to his daughter." LaVigne does not contend that such a finding of fact is clearly erroneous, nor do we think it is under the circumstances.

¶21 In addition, LaVigne's personal knowledge of the phone call buttresses the conclusion that his trial counsel's performance did not fall below an objective standard of reasonableness. Trial counsel could reasonably prioritize other, more important matters before reminding LaVigne about facts concerning other-acts evidence that LaVigne would or should likely know already. In retrospect, counsel might have advised LaVigne about the State's possession of the recorded phone call and to not challenge the State to prove certain facts, but we do not rely on hindsight when determining whether counsel's performance was objectively reasonable. *See* ***State v. Pico***, 2018 WI 66, ¶22, 382 Wis. 2d 273, 914 N.W.2d 95. Under the relevant circumstances, counsel did not perform deficiently by deciding not to provide the recording or transcript of the jail phone call to LaVigne.

### B. Counsel's decision not to prepare or call LaVigne's daughter as a witness

¶22 LaVigne argues that his trial counsel was also deficient for not preparing or calling LaVigne's daughter as a witness. He contends that his daughter's testimony would have refuted the State's argument that he had instructed her about what to tell police. He also asserts that his daughter could

have produced text messages that she had sent to Zoey before the recorded jail call, in which she confronted Zoey about "going after" her dad.

¶23    "[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review.  The Constitution does not oblige counsel to present each and every witness that is suggested to him [or her]." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (citation omitted).  Moreover, "[a]s a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995).

¶24    Counsel made a reasonable, strategic decision not to call LaVigne's daughter as a witness.  Counsel testified at the *Machner* hearing that LaVigne's daughter "wasn't very strong" as a witness and "was emotional."  Counsel also perceived LaVigne's daughter to be asking counsel "what do you want me to testify to?  And it didn't seem like she had a lot of facts that she was aware of at that time that would be helpful."

¶25    LaVigne's daughter might have been able to testify about text messages between her and LaVigne on the night of the incident involving Zoey, but those messages would have shown LaVigne telling his daughter his version of the facts: "[Zoey] was drunk and acting crazy and I kept trying to push her away."  Although LaVigne's daughter responded, "I know," suggesting she might have knowledge of the facts, she later asked "what happened[?]"  LaVigne then responded, "I would rather just talk to you about it instead of text."  Thus, the texts largely corroborated trial counsel's testimony that LaVigne's daughter did not know much of the underlying facts and that her testimony would likely have been informed by LaVigne's version of events.  Under the circumstances, counsel could

reasonably determine that LaVigne's daughter would not have been a persuasive or an effective witness because of her emotions, her relationship to LaVigne, and her lack of personal knowledge about the incident.

¶26 In addition, LaVigne's counsel testified that he was concerned that having LaVigne's daughter testify in the Outagamie County case "was going to compromise what [LaVigne] had to deal with in Marinette [County]." Such a concern was reasonable because his daughter's testimony could have adversely affected LaVigne's defense to the then-unresolved charges in Marinette County. For example, LaVigne's daughter could have revealed inculpatory statements by LaVigne, or she might have made statements that could be used to impeach her later testimony in the Marinette County case. Ultimately, as the circuit court found, LaVigne himself agreed that his daughter should not be called as a witness, which further supports the reasonableness of counsel's decision not to call her as a witness.

¶27 Counsel's decision not to spend more time preparing LaVigne's daughter was also objectively reasonable under the circumstances. Counsel testified that he

> saw the whole Marinette matter as collateral. I kn[e]w it would have an impact. But I thought the strength of the Outagamie case was strong enough to be decided on its own merits. And that was not our focus as to what occurred in Marinette County. Our focus was on what was being claimed in Outagamie County.

Indeed, although refuting the other-acts evidence related to Zoey was an important part of LaVigne's defense, counsel could reasonably focus his attention on the underlying allegations in the present case.

11

¶28 Moreover, it is undisputed that counsel met with LaVigne's daughter at least once to discuss her potential testimony. The circuit court also found that "counsel was aware of what the daughter had said in her police interview." While LaVigne suggests that his daughter would have been less emotional if counsel had spent more time preparing her, he fails to identify any evidence in the record to support that assertion. To the contrary, LaVigne's daughter testified at the *Machner* hearing—over a year after the trial—that she was still "pretty upset about the whole situation[.]"

### C. Counsel's decision not to recall a witness to testify about LaVigne's statement

¶29 LaVigne testified at trial that he would stand behind the students in his keyboarding class to ensure they "were typing properly." When asked twice on cross-examination whether LaVigne told Officer Stahmann that LaVigne would not stand behind students, LaVigne responded, "No." Prior to this line of questioning, the jury had viewed portions of the recorded interview between Stahmann and LaVigne.

¶30 LaVigne argues his trial counsel performed deficiently by not recalling Officer Stahmann as a witness to testify that LaVigne had not denied standing behind his students. He asserts that the prosecutor's questioning implied that he had lied to Stahmann, which reflected poorly on LaVigne's credibility. He further argues that Stahmann's rebuttal testimony would not have been cumulative because it would have corroborated his testimony.

¶31 We reject LaVigne's arguments. LaVigne established, through his own testimony, that he regularly stood behind the students and that he never previously denied doing so. Although the prosecutor's questioning might have

12

implied that LaVigne had previously lied to Officer Stahmann about where LaVigne stood in the classroom, the State did not introduce any evidence to that effect or attempt to impeach LaVigne's statements. The jury therefore had no basis to find that LaVigne had previously lied to Stahmann. Moreover, the jury viewed portions of LaVigne's recorded interview with Stahmann, and it would have known that LaVigne's statements to Stahmann were consistent with his testimony at trial. It would have been reasonable for LaVigne's trial counsel to conclude—based on the evidence presented at trial—that recalling Stahmann was unnecessary and largely cumulative of evidence already presented and that Stahmann's potential testimony could have only minimal, if any, value in bolstering LaVigne's credibility.

### D. Counsel's lack of knowledge regarding a magazine article used to impeach LaVigne's expert witness

¶32    In support of LaVigne's defense at trial, forensic psychologist Hollida Wakefield testified as an expert witness about delayed reporting. During the State's cross-examination, she acknowledged that a "pro-pedophilia magazine" in Europe had interviewed her and her late husband around the early 1990s. When asked whether the magazine had represented that Wakefield believed "pedophilia is an acceptable expression of God's will," Wakefield responded: "I did not say that." Wakefield then explained that her late husband, who was a Lutheran minister, made a poorly phrased comment about "free will" that was taken out of context. Wakefield further testified that "nowhere in our writings will you find that we approve of adult/child contact" and that she has "never been in favor of adult/child sexual contact and neither was [her] late husband."

¶33    LaVigne argues on appeal that his trial counsel performed deficiently by failing to investigate the magazine article used to impeach

13

Wakefield. He also asserts that, due to counsel's lack of investigation, counsel failed to rehabilitate Wakefield on redirect examination.

¶34 LaVigne's arguments are undeveloped. "[A] defendant who alleges a failure to investigate on the part of his or her counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the case." *State v. Leighton*, 2000 WI App 156, ¶38, 237 Wis. 2d 709, 616 N.W.2d 126. LaVigne does not explain what counsel's investigation into Wakefield's history would have revealed, nor does he explain how further investigation would have altered the outcome of this case. Although LaVigne suggests that counsel failed to rehabilitate Wakefield on redirect due to an insufficient investigation, counsel testified that he did not ask about the article on redirect because he thought Wakefield had provided "an adequate explanation" to the State's questioning by not accepting or affirming the views expressed in the article. He also testified, "I thought she was good on what I wanted her to testify to. And that's all I thought we needed." Indeed, the transcript establishes that Wakefield explained her disagreements with the article and that she rejected any suggestion that she approved of pedophilia or sexual contact between adults and children. Therefore, counsel could reasonably determine that Wakefield did not need to be rehabilitated on redirect examination.

*E. Counsel's decision not to object during the State's closing argument*

¶35 The State began its closing argument by stating: "Throughout this trial, we heard about Jason LaVigne's dark side. His pattern of attraction towards young, underage girls. His disgusting desire to be sexually gratified by these young, underage girls in a public setting." LaVigne's trial counsel later stated at

the *Machner* hearing that he considered objecting to the State's closing argument but did not do so because he "concluded it was argument."

¶36    LaVigne argues his trial counsel performed deficiently by failing to object to the State's closing argument.  He contends that the State's argument "was an attack on [his] character" and "vilif[ied him] … as one who seeks young girls for sexual satisfaction."

¶37    Contrary to LaVigne's arguments, the prosecutor's comments—that LaVigne had a "dark side" and a "pattern of attraction towards young, underage girls"—were not impermissible.  Attorneys are given "considerable latitude in closing arguments."  *State v. Hurley*, 2015 WI 35, ¶95, 361 Wis. 2d 529, 861 N.W.2d 174 (citation omitted).  Considered in the context of the State's case and the prosecutor's closing argument, it would have been reasonable for trial counsel to conclude that the prosecutor was emphasizing LaVigne's "pattern of attraction" for the permissible purposes of showing LaVigne's motive, intent, and lack of mistake or accident in rubbing his penis on Lyla's back.  *See* WIS. STAT. § 904.04(2)(a).  Indeed, other acts that demonstrate a "pattern" can be highly probative of facts at issue in a case.  *See, e.g.*, *State v. Opalewski*, 2002 WI App 145, ¶¶17-18, 256 Wis. 2d 110, 647 N.W.2d 331 (recognizing that the pattern of other acts showed how the acts were similar to each other and that the other-acts evidence was relevant to proving intent, motive, and absence of mistake); *see also State v. Midell*, 39 Wis. 2d 733, 737, 159 N.W.2d 614 (1968) (upholding a decision to admit other-acts evidence that "show[ed] a pattern and a state of mind of the defendant").

¶38    Even if the State's closing argument did suggest that LaVigne had a character and a propensity to commit sexual assault, it would have been

reasonable for trial counsel to determine, under the circumstances, that the State's closing argument was permissible and that LaVigne would not benefit from his trial counsel objecting and calling attention to the State's argument. Accordingly, trial counsel did not perform deficiently by choosing not to object to the State's closing argument.

*F. Counsel's decision to advance two consistent defense theories*

¶39 LaVigne's trial counsel asserted in closing arguments that there were multiple reasonable doubts as to whether LaVigne committed the offense of repeated sexual assault of a child. Counsel argued that LaVigne could not have committed the offense during the first three months of 2000, which was the relevant period of time alleged in the amended Information, because LaVigne was on paternity leave during those months. Counsel also argued, however, that it would be impossible for LaVigne to have committed the offense because the back of the chair that Lyla would have sat in was too high for LaVigne to press his penis on her back. As counsel described it, LaVigne "would have to be some sort of a contortionist to put his penis up near her shoulder as she sat in the chair."

¶40 LaVigne contends his trial counsel performed deficiently because he argued "competing" defense theories, which "confuse[] the jury as to what the defense really is." He argues that such a strategy undermines the outcome of the trial.

¶41 LaVigne's argument is a nonstarter. LaVigne's trial counsel explained at the ***Machner*** hearing that his strategy going into trial was to show that LaVigne could not have physically committed the offense based on the height of the classroom chairs. When the State amended the Information to reflect a charging period between January 1, 2000, and March 31, 2000, counsel also

16

attempted to show that LaVigne was on paternity leave during that time. Counsel recognized, however, that the paternity-leave argument was not a complete defense because LaVigne and his wife "were uncertain as to the length of [LaVigne's] time … away from school," so "the door was open for him to be there at least part time at different days." Indeed, LaVigne testified at trial that he was on paternity leave "[f]or a large chunk" of the time when the offenses allegedly occurred. Nonetheless, counsel believed that "either way … it created a reasonable doubt."

¶42    As the circuit court correctly observed, "[t]hese two theories are concurrent to each other, not competing. There was little risk that the jury would be confused about [LaVigne's] position." Trial counsel's argument was abundantly clear that LaVigne was on paternity leave for a majority of the relevant time period, which reduced LaVigne's opportunity to commit the offense, and that LaVigne could not physically commit the offense—even when he was in class—due to the height of the chairs in the classroom. Counsel could reasonably believe that if a jury accepted one or both of these arguments, a jury might find that the State failed to prove the offense beyond a reasonable doubt. Trial counsel did not perform deficiently by arguing two compatible defenses.

G.  *Counsel's decision not to present videos prepared by LaVigne*

¶43    In preparation for trial, LaVigne created a few short video files, which he thought would be relevant to his defense, from larger video clips that contained police interviews of Lyla and Collar. LaVigne believed that one part of Lyla's interview was particularly important because "she said the word neck and pointed to her neck when she described the touching." LaVigne also believed that part of Collar's interview was important because "[s]everal times he said that he

17

had very poor memory of anything that happened." LaVigne's trial counsel did not present either of these two videos at trial.

¶44 LaVigne argues his trial counsel performed deficiently by not playing the videos at trial. He contends that the video of Lyla describing the touching near her neck area would have impeached her trial testimony that LaVigne pressed his penis on a lower part of her back. He also asserts that trial counsel could have impeached Collar's trial testimony by showing Collar's video statement that Collar had a poor memory about Lyla's comments to him in 2000 and by Collar failing to mention a note or computer in his interview.

¶45 LaVigne's argument again misses the mark. As the circuit court appropriately observed, Lyla's statement in the video that LaVigne had touched her around her neck was largely consistent with her trial testimony. Although Lyla testified that she felt LaVigne's erect penis on her "upper back," she also testified that LaVigne would "stand behind me and touch my neck with his hands and sometimes along my side with his hands." Accordingly, playing a short video of Lyla saying "neck" and pointing to an area around her neck would not have impeached her credibility because her statements in the video were consistent with her testimony at trial.

¶46 Similarly, LaVigne's trial counsel was able to establish on cross-examination—without playing any videos—that Collar had a poor recollection of what occurred in 2000. Collar testified that he could not recall what time of day, day of the week, or month that he had escorted Lyla down to LaVigne's classroom. He described Lyla as appearing nervous, but he struggled to explain how she appeared nervous, other than saying she was shaking a little bit. Collar also testified that he could not recall whether Lyla told him why she

was nervous, nor could he recall whether he gave Lyla any advice after her meeting with LaVigne. Collar conceded that he "possibly" told Officer Stahmann that his "memory was real vague," but he had not read the police report. Nearly the entire cross-examination of Collar emphasized Collar's poor memory of when he walked Lyla down to LaVigne's classroom. Thus, playing a video of Collar stating he had a "poor memory" of the event would have only reiterated what trial counsel had already established in cross-examination.

¶47    To the extent trial counsel failed to show that Collar did not previously mention that Lyla had said something about a note or a computer, trial counsel would have needed to show the entire video of Collar's interview to establish this fact, not one short video clip. Regardless, it was readily apparent from Collar's testimony that his memory about the note or computer statement was questionable. He testified: "I can remember like a note or a computer or something. What it said I don't remember." In short, trial counsel acted reasonably by choosing not to play the videos that LaVigne had created.

## H.  Counsel's decision not to investigate the home of an other-acts witness

¶48    Natasha testified at trial that LaVigne massaged her shoulder for about thirty seconds while he drove her home one evening, and upon arriving at her home, LaVigne exited the vehicle, "put his arms around [her,] and tried to kiss [her]." Natasha then pushed LaVigne away and ran into her home. At the time, Natasha was fifteen years old. Natasha specifically testified that LaVigne was driving the vehicle and that he used his right hand to massage her left shoulder. At the trial in the Marinette County case, Natasha again testified about this incident, but she acknowledged on cross-examination that she, not LaVigne, drove LaVigne's vehicle that night.

¶49    LaVigne argues his trial counsel performed deficiently by failing to investigate the layout of Natasha's home. He contends that if counsel had done so, "he would have found that [Natasha's] driveway was to the left of the front door to [her] house," and counsel could have then asked Natasha why she did not go directly to her home's front door from the passenger side of the vehicle. He also asserts that such questioning would have shown that Natasha's story was implausible and impeached Natasha's credibility.

¶50    Trial counsel's decision not to investigate the layout of Natasha's home was reasonable under the circumstances. Even if Natasha had admitted to driving the vehicle on cross-examination, such an admission would not have contradicted or disproved her testimony that LaVigne massaged her shoulder, wrapped his arms around her, and attempted to kiss her. LaVigne testified at trial that Natasha "was pretty excited to drive" his vehicle and "had stopped in front of the [vehicle] to take a selfie." He admitted that he "got into the selfie with her" and told her: "I feel like I am dropping you off for a date and I should be asking for a kiss." Although LaVigne denied attempting to kiss Natasha, LaVigne's own testimony established that he was physically close to Natasha and that he made a concerning comment about kissing her. The jury could have therefore believed Natasha's testimony about the attempted kiss even if it believed that Natasha had driven LaVigne's vehicle.

¶51    In addition, and as noted earlier, LaVigne's trial counsel reasonably prioritized preparing a defense to the charged crime over defending against every detail of the other-acts evidence in this case. The fact that Natasha drove instead of LaVigne was a minor detail explaining how LaVigne and Natasha came to be standing in front of LaVigne's vehicle. A jury might have found Natasha slightly less credible had she admitted on cross-examination that she had, in fact, driven

the vehicle, but LaVigne's own testimony still established that he had made a concerning comment about kissing Natasha while in close proximity to her. Counsel could reasonably decide to avoid focusing on the small factual discrepancies in Natasha's testimony and to focus instead on the allegations in the present case.

### I. Cumulative prejudice

¶52    Finally, LaVigne argues "that in the aggregate, trial counsel's multiple deficient actions and omissions prejudiced [his defense]." This argument fails, however, because LaVigne has not shown that his trial counsel performed deficiently in any respect. Courts do not consider the cumulative effect of counsel's alleged deficiencies where "the alleged errors, taken in isolation, did not constitute a deficient act or omission." *State v. Hunt*, 2014 WI 102, ¶55 n.15, 360 Wis. 2d 576, 851 N.W.2d 434. As discussed above, none of trial counsel's alleged deficiencies amount to deficient performance, which leaves nothing for us to aggregate.

## II. Discretionary reversal

¶53    LaVigne next argues that we should vacate his conviction and grant him a new trial under WIS. STAT. § 752.35 because "he was convicted based upon the untruthful testimony of [Natasha]." LaVigne contends that Natasha's subsequent testimony in the Marinette County case was "vastly different" from her "very detailed testimony" in this case that LaVigne drove the vehicle and used his right hand to massage her shoulder. He contends that these discrepancies create a question about Natasha's veracity and explain why he excited the vehicle, which bolsters his credibility.

¶54     This court may reverse a judgment and remand for a new trial if it appears from the record that the real controversy has not been fully tried or it is probable that justice has for any reason miscarried. WIS. STAT. § 752.35. The real controversy has not been fully tried if:

> (1) Either the jury was not given an opportunity to hear important testimony that bore on an important issue in the case, or (2) the jury had before it testimony or evidence which had been improperly admitted, and this material obscured a crucial issue and prevented the real controversy from being fully tried.

*State v. Burns*, 2011 WI 22, ¶24, 332 Wis. 2d 730, 798 N.W.2d 166 (citation omitted). In addition, justice has been miscarried if "there would be a substantial probability that a different result would be likely on retrial." *Id.* (citation omitted). "We exercise our discretionary-reversal powers 'only in exceptional cases.'" *Id.*, ¶25 (citation omitted).

¶55     This is not an exceptional case warranting discretionary reversal. As discussed more fully below, the circuit court did not erroneously exercise its discretion by admitting other-acts evidence involving Natasha. In addition, Natasha's incorrect statements—that LaVigne was driving (instead of her) and that LaVigne was massaging her shoulder with his right hand (instead of his left hand)—are minor, incidental facts to her testimony. Although Natasha's change in testimony in the Marinette County case bears on her credibility and further explains that LaVigne needed to exit the vehicle to return to the driver's seat, Natasha maintained in the Marinette County case that LaVigne massaged her shoulder and attempted to kiss her. Moreover, and most significantly, Natasha's testimony concerned other-acts evidence, not the charge for which LaVigne was on trial—i.e., repeatedly rubbing his erect penis on Lyla's back.

¶56     In light of LaVigne's admission that he made a concerning comment about kissing Natasha in front of his vehicle and the other-acts evidence involving Zoey, there is not a reasonable probability that Natasha's change in testimony in the Marinette County case would affect the jury's conclusion that LaVigne violated WIS. STAT. § 948.025(1) by repeatedly rubbing his erect penis on Lyla. In short, the real controversy has been tried in this case, and it is not probable that justice has been miscarried.

## III.  Newly discovered evidence

¶57     LaVigne also argues that the circuit court erroneously exercised its discretion by not holding an evidentiary hearing to consider his request for a new trial based on newly discovered evidence.  He contends that he discovered after his trial and conviction that the classroom chair produced at trial was "a standard size."  He suggests that this evidence would have rebutted the State's trial argument that Lyla might have sat in chair with a lower height than the chair shown at trial.

¶58     A circuit court is required to hold a hearing on a postconviction motion "only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433.  Whether a motion meets this standard is a question of law that we review de novo. *Id.*, ¶9.  "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *Id.*  We review a court's discretionary decisions for an erroneous exercise of discretion. *Id.*

¶59    To set aside a judgment of conviction based on newly discovered evidence, the defendant must prove, by clear and convincing evidence, that "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted).  If the defendant establishes those four factors, then the court must determine whether a reasonable probability exists that a different result would be reached in a trial.  *Id.*

¶60    LaVigne alleged in his postconviction motion that Clyde Trudeau, the sales person who sold the chairs that were to be used in LaVigne's classroom, said that the chairs were "an Artco-Bell Transitional Series Model 7167 Uniflex Chair with casters," which "comes in a standard height, with or without casters." LaVigne further asserted that this evidence "was not negligently missed because the height of the chair was not an issue until cross[-]examination at trial" and that the evidence "is not cumulative [because] Mr. Trudeau would verify the chair in question is the same style chair with a standardized height."  LaVigne also claimed that there is reasonable doubt as to his guilt because, contrary to the State's argument at trial, "this new evidence [showed] that there is no way the chair had a different height."

¶61    Contrary to the allegation in LaVigne's postconviction motion, the height of the chairs was an issue at trial prior to any cross-examination by the State. LaVigne's main defense at trial was that the height of the chairs used in his classroom in 2000 would have made it physically impossible for him to commit

24

the offense.[3]  To potentially prevail on that defense, LaVigne needed to establish the type of chair used in his classroom in 2000, the height of those chairs, and his height as compared to those chairs.  LaVigne produced evidence addressing each of those issues by testifying that a chair brought to the courtroom was "exactly the same" as the chairs used in his classroom in 2000, that he was five feet, seven inches tall, and that, in relation to the chair in the courtroom, his genitalia was "just below the edge of the top of the chair."

¶62    Although Trudeau might now be able to provide additional testimony addressing the model and height of the chairs that were to be used in LaVigne's classroom, LaVigne should have spoken to Trudeau before trial because LaVigne knew that such information would have been helpful to his defense.  LaVigne has not provided any explanation for not doing so—other than his erroneous argument that the height of the chair was not an issue—and his postconviction motion therefore fails to allege that he was not negligent in seeking evidence from Trudeau.

¶63    The record also conclusively establishes that Trudeau's potential testimony would be cumulative of evidence already presented at trial.  "Newly discovered evidence is cumulative where it tends to address 'a fact established by existing evidence.'"  *State v. McAlister*, 2018 WI 34, ¶37, 380 Wis. 2d 684, 911 N.W.2d 77 (citation omitted).  As alleged in LaVigne's postconviction motion, Trudeau's testimony would establish that the chair used in LaVigne's classroom

---

[3] At the *Machner* hearing, LaVigne's trial counsel confirmed what the trial record plainly demonstrates—namely, that "from day one our strategy was that it was just physically impossible where this occurred in the manner that it was being claimed."  Trial counsel further testified that part of LaVigne's defense was based on the height of the chair and that the chair was a critical issue.

and produced at trial "comes in a standard height, with or without casters." Although no witness testified at trial about whether the chair came in a "standard height," LaVigne unequivocally testified at trial that the chair brought into the courtroom was *exactly the same* as the chairs used in his classroom in 2000. In other words, LaVigne's trial testimony established that the height of the chair in the courtroom was the same height as the chairs used in his classroom in 2000. The superintendent and a computer technician for the Little Chute School District also testified, respectively, at trial that the chair in the courtroom was the same chair as the chairs used in the area of the school where LaVigne's class was located and that the chair was the "same type of chair" that was used in the Little Chute High School computer room in 2000. Trudeau's testimony that "the chair in question is the same style chair with a standardized height" is therefore cumulative of facts already established by existing evidence. *See id.*

¶64 Finally, even if Trudeau would testify to the facts alleged in LaVigne's postconviction motion, Trudeau's testimony would not create a reasonable probability that a different result would be reached in a new trial. "A reasonable probability of a different outcome exists if 'there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt.'" *State v. Plude*, 2008 WI 58, ¶33, 310 Wis. 2d 28, 750 N.W.2d 42 (alterations in original; citation omitted). At most, Trudeau's testimony would establish that he sold the chairs that were to be used in LaVigne's classroom and that those chairs were a standard height. He could not establish, however, that those chairs *were*, in fact, used in the classroom or that Lyla sat in one of those chairs when LaVigne rubbed his penis against her back. Thus, Trudeau's testimony would not debunk the State's theory that the chair used in the courtroom at trial might not have been the chair in which

Lyla sat. Accordingly, there is not a reasonable probability that a jury, considering both the evidence presented at trial and the facts alleged in LaVigne's postconviction motion, would have a reasonable doubt as to LaVigne's guilt. *See id.*

¶65 In short, LaVigne's postconviction motion fails to allege sufficient facts to entitle him to relief, and the record conclusively establishes that he is not entitled to relief. The circuit court therefore did not erroneously exercise its discretion by denying, without a hearing, LaVigne's request for a new trial based on newly discovered evidence.

## IV. Erroneous exercises of discretion before and during trial

¶66 LaVigne's final arguments challenge several of the circuit court's discretionary decisions before and during trial. We review these decisions for an erroneous exercise of discretion. *Allen*, 274 Wis. 2d 568, ¶9.

¶67 LaVigne first argues that the circuit court erroneously exercised its discretion by not excusing Juror Wegand, a juror believed to have improperly communicated with Lyla during the trial, for being biased. LaVigne's brother, Allen LaVigne, testified at a break in the trial (outside the presence of the jury) that he had observed a juror give a "sympathetic look" and mouth or say the words "so sorry" to Lyla. LaVigne's brother acknowledged, however, that he was "too far away" to know exactly what was said or gestured. Lyla subsequently testified that she did not recall any juror looking or mouthing anything to her. Later, when the jurors were back in the courtroom, the court asked if any of them had any kind of contact or communication with someone in the "back of the courtroom." None of the jurors responded affirmatively, with the exception of one juror

27

acknowledging that she had asked for a Kleenex. The court did not excuse any jurors.

¶68 A criminal defendant has a constitutional right to an impartial jury. *State v. Funk*, 2011 WI 62, ¶31, 335 Wis. 2d 369, 799 N.W.2d 421. A juror is presumed to be impartial, and the party challenging a juror's impartiality bears the burden of rebutting this presumption and proving bias. *Id.* A circuit court's findings of fact as to a juror's bias will not be overturned unless they are clearly erroneous. *See State v. Lindell*, 2001 WI 108, ¶¶36, 39, 245 Wis. 2d 689, 629 N.W.2d 223.

¶69 The circuit court found that Juror Wegand had not engaged in improper communications with Lyla, and it concluded that Wegand was not biased. These findings are not clearly erroneous because no juror admitted to communicating with anyone in the courtroom gallery, nor could Lyla recall a juror interacting with her. The court could also reasonably conclude that LaVigne's brother misinterpreted what had occurred because he was sitting "too far away" from the purported event. Accordingly, the court did not erroneously exercise its discretion by not excusing Juror Wegand.

¶70 LaVigne next argues that the circuit court erroneously exercised its discretion by allowing the State to amend the relevant period of time alleged in the Information from the first three months in 1999 to the first three months in 2000. He contends that he was prejudiced by the amendment because he "could not fully develop an alibi defense" that he was on paternity leave at the beginning of 2000.

¶71 A circuit court may allow amendment of the Information at trial "to conform to the proof where such amendment is not prejudicial to the defendant." WIS. STAT. § 971.29(2). A defendant is not prejudiced by an amendment to the

Information at trial if the defendant had notice of "the nature and cause of the accusations." **State v. Neudorff**, 170 Wis. 2d 608, 619, 489 N.W.2d 689 (Ct. App. 1992).

¶72 Amending the Information to conform to the proof at trial did not prejudice LaVigne's defense. Although the amended Information changed the year in which the offense allegedly occurred, it did not change the nature or substance of the allegations, charge a new or additional offense, or preclude the assertion of a defense. Furthermore, LaVigne's trial counsel had notice at least two weeks before trial that there was a potential mistake in the charging period. Consequently, trial counsel began developing an alibi defense by submitting a public records request to ascertain the timing of LaVigne's paternity leave during the 1999-2000 school year, but counsel was later "told by the school that those records no longer exist[ed]."

¶73 Despite the obstacles LaVigne faced in developing his alibi defense, he did not earlier notify the circuit court about the apparent mistake in the charging period or seek to postpone the trial to gather additional evidence. Rather, as the court recognized in its decision allowing the amendment, "there was a strategic decision not to raise [the] issue[] prior to the jury being sworn." Nevertheless, the court, with the State's agreement, removed barriers to LaVigne asserting the alibi defense by waiving LaVigne's obligation to give the State notice of the alibi defense and by permitting LaVigne's wife and an additional witness to testify without being named as witnesses on LaVigne's witness list. *See* WIS. STAT. § 971.23(8)(a). LaVigne also testified on his own behalf that he "was on paternity leave" for "a large chunk of" the time period alleged in the amended Information.

29

¶74    LaVigne was therefore able to assert an additional defense he would not otherwise have had under the original Information. While LaVigne suggests that he did not have enough time to develop witness testimony or discover other employment records to support his alibi defense, he has not identified any documents or witnesses that would have been found with additional time to investigate. Under the circumstances, allowing amendment of the Information at trial did not prejudice LaVigne's defense because he had adequate notice of the allegations and of the charge, and because the amendment allowed him to assert an additional defense. As a result, the circuit court did not erroneously exercise its discretion by allowing the State to amend the Information at trial.

¶75    LaVigne also argues that the circuit court erroneously exercised its discretion by not instructing the jury to disregard Zoey's testimony that there was blood in her swimsuit. Before trial, the court concluded that other-acts evidence involving Zoey would be limited to "touching" allegations and that allegations of sexual intercourse would be inadmissible unless raised by LaVigne. At trial, Zoey testified that "[t]here was some blood left in [her swimsuit]" in response to LaVigne's trial counsel asking her whether "there [was] any damage done to the swimsuit." Trial counsel did not object to Zoey's testimony, however, and neither trial counsel nor the State asked any follow-up questions regarding the blood.

¶76    Contrary to LaVigne's argument, Zoey's testimony was admissible because the circuit court specifically did not "clos[e] the door" on LaVigne eliciting testimony related to Zoey's allegations of intercourse, and LaVigne's trial counsel elicited the testimony at issue. Although LaVigne suggests—in a single sentence—that his trial counsel was ineffective for eliciting the testimony, he does not develop that argument on appeal, and he failed to raise this issue in the circuit court or at his *Machner* hearing. Accordingly, we need not consider this

undeveloped ineffective assistance of counsel claim. *See State v. Thompson*, 222 Wis. 2d 179, 190 n.7, 585 N.W.2d 905 (Ct. App. 1998) (we need not consider an ineffective assistance of counsel claim that was not raised in the trial court or addressed at a *Machner* hearing). Finally, even if the testimony was inadmissible, the court had no duty to sua sponte strike Zoey's testimony. *See State v. Delgado*, 2002 WI App 38, ¶12, 250 Wis. 2d 689, 641 N.W.2d 490 ("It is not the duty of the trial court to *sua sponte* strike testimony that is inadmissible.").

¶77 Lastly, LaVigne argues the circuit court erroneously exercised its discretion by admitting the other-acts evidence at trial. Other-acts evidence is admissible where: (1) it is offered for a permissible purpose pursuant to WIS. STAT. § 904.04(2)(a); (2) it is relevant under the two relevancy requirements in WIS. STAT. § 904.01; and (3) its probative value is not substantially outweighed by the risk or danger of unfair prejudice under WIS. STAT. § 904.03. *State v. Marinez*, 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399. In a child sexual assault case, the greater latitude rule under § 904.04(2)(b) permits a more liberal admission of other-acts evidence and applies to each prong of our other-acts analysis. *See Marinez*, 331 Wis. 2d 568, ¶20.

¶78 LaVigne does not dispute that the State offered the other-acts evidence for the permissible purposes of proving LaVigne's motive, method of operation, intent, and lack of mistake or accident. *See* WIS. STAT. § 904.04(2)(a). Nor does he dispute that the State had to prove that he intentionally touched Lyla for the purpose of sexual arousal or gratification and to prove that Lyla was a credible witness, both of which were consequential facts in this action. *See State v. Gutierrez*, 2020 WI 52, ¶33, 391 Wis. 2d 799, 943 N.W.2d 870; WIS. STAT. §§ 948.01(5)(a), 948.025(1). He argues, however, that the other-acts evidence was not probative of these consequential facts because the environments in which the

31

other acts took place were different in nature from the classroom environment where the alleged acts took place in this case. He also argues that the other acts are too remote in time from the alleged offense in this case.

¶79 "'The measure of probative value in assessing relevance is the similarity between the charged offense and the other act.' Similarity is demonstrated by showing the 'nearness of time, place, and circumstance' between the other-act and the charged crime." *Hurley*, 361 Wis. 2d 529, ¶79 (citations omitted). A circuit court has discretion to determine whether other-acts evidence is too remote. *Id.*

¶80 Here, despite the length of time between the charged offense and the other acts, the circuit court concluded that the other acts were probative of LaVigne's method of operation because the charged offense and the other acts were similar in nature and environment. We agree that the charged offense and the other acts were similar. First, the charged offense and the other acts involved unwanted, intimate contact with the victims. Second, all of the victims were female high school teenagers—ages fifteen or sixteen. Third, the acts occurred when the victims were isolated from others but not completely alone. Fourth, the victims were subject to LaVigne's control in his classroom, on his boat, or in his car. Fifth, LaVigne was acquainted with all of the victims through either his daughter or his role as a teacher.

¶81 Although LaVigne is correct that there was a roughly seventeen-year gap between the alleged offense and the other-acts evidence, that gap is not dispositive of whether the other acts are probative. "Even when evidence may be considered too remote, the evidence is not necessarily rendered irrelevant if the remoteness is balanced by the similarity of the two incidents." *Id.*, ¶80. On

balance, the similarities between the charged offense and the other acts outweigh the time between LaVigne's actions. In addition, and as the circuit court recognized, the probative value of the other-acts evidence is further buttressed by the greater latitude rule, which permits a more liberal admission of other-acts evidence. *See id.*, ¶59.

¶82 LaVigne faults the circuit court for relying on the greater latitude rule, and he contends that the greater latitude rule is not a rule of "automatic admission." The court, however, did not treat the greater latitude rule as a rule of "automatic admission." Rather, it considered each prong of the other-acts analysis, and, as it related to the relevancy prong, the court concluded that the similarity between the charged offense and the other acts outweighed the length of time between LaVigne's actions, especially in light of the greater latitude rule. The court did not erroneously exercise its discretion in weighing the probative value of the other-acts evidence.

¶83 LaVigne also argues that the other-acts evidence was "unfairly prejudicial" because the State's closing argument used the other-acts evidence for impermissible purposes and to arouse the jury's sense of horror and to provoke it to punish him. LaVigne fails to recognize, however, that we consider only the facts that were before the circuit court when reviewing the court's decision to admit other-acts evidence. *See Marinez*, 331 Wis. 2d 568, ¶45. "[W]e will not conclude that a circuit court erred by failing to divine exactly how the evidence would be used at trial." *Id.*

¶84 When considering only the facts before the circuit court when it decided to admit the other-acts evidence, we conclude the court did not erroneously exercise its discretion. The court considered the prejudicial effect of

the other-acts evidence and concluded that it did not substantially outweigh the probative value of the evidence, especially once the jury was given a limiting instruction.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.