COURT OF APPEALS
DECISION
DATED AND FILED

January 18, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP966-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2014CF363

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

 PLAINTIFF-RESPONDENT,

 V.

DALLAS EUGENE ROBINSON,

 DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Douglas County: GEORGE L. GLONEK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dallas Eugene Robinson appeals from a judgment of conviction, following a jury trial, for felony murder as a party to the crime and

from an order denying his motion for postconviction relief. Robinson contends he is entitled to a new trial based on multiple claims of ineffective assistance of counsel and in the interest of justice. We reject all of Robinson's claims and affirm.

## BACKGROUND

¶2 The State alleged in the criminal complaint that Robinson and his four codefendants—Chance Andrews, Kyham Dunn, Teah Phillips, and Kane Robinson[1]—traveled from Duluth, Minnesota, to Superior, Wisconsin, on September 30, 2014, to rob a marijuana dealer, Garth Velin. During the commission of that robbery, Andrews shot and killed Velin. The State charged Robinson with felony murder as a party to the crime, and the case proceeded to trial.[2]

¶3 At Robinson's jury trial, Phillips and Robinson testified that Andrews shot and killed Velin, and both testified unequivocally that they were not aware prior to the shooting that Andrews had a gun or that he intended to rob Velin. Phillips—who was in a relationship with Andrews at the time—reported to law enforcement and at trial that she drove Andrews, Robinson, Kane, and Dunn to Superior at Andrews' request "to get some money." The group first stopped at

---

[1] Kane Robinson is Robinson's brother. For clarity, we will refer to him as "Kane" throughout this decision.

[2] Robinson's four codefendants were also charged in connection with the shooting. Andrews pled guilty to felony murder on June 9, 2015, in Douglas County case No. 2014CF358. Kane was convicted of felony murder by a jury on June 23, 2015, in Douglas County case No. 2014CF364. Dunn was acquitted of felony murder by a jury on January 29, 2016. Phillips pled to attempted armed robbery with use of force on April 19, 2016, in Douglas County case No. 2014CF362. Robinson's case was the last to resolve, with his trial concluding on June 10, 2016.

Robinson and Kane's grandparents' home in Superior before continuing on to Velin's home.

¶4     When they arrived at Velin's home, Andrews instructed Phillips to go to the door "to see if [Velin was] home."[3]  Phillips, who did not know Velin, "admitted she had used the ruse of telling [Velin] she was looking for a lost dog" when she knocked on his door.  She then returned to the vehicle and confirmed—after Andrews showed her a picture of Velin from Facebook—that Velin had answered the door.[4]  According to Phillips, the group then drove a block away to a Subway restaurant because Robinson and Dunn needed to use the bathroom. Phillips testified that Robinson, Dunn, and Andrews first stood behind the car and talked, then stated they would be "right back," and walked "down the alley" toward Velin's house.  Kane and Phillips remained in the car.

¶5     Robinson testified at trial that the group had been looking for marijuana on the day of the shooting, and he believed that they were going to Velin's home to get marijuana.  He claimed that only Dunn and Andrews were talking behind the car and that he remained in the car with Phillips and Kane. According to Robinson, when Andrews and Dunn began walking toward Velin's house, he waited in the car for thirty to forty-five seconds before getting "bored" and following them.

¶6     Robinson testified that when he got to Velin's house, he saw Andrews and Dunn walk directly into the house without knocking on the door

---

[3] At trial, Phillips testified that Andrews made her go to the door to see if Velin's girlfriend was home.

[4] Robinson's testimony corroborated this sequence of events.

while he was about ten to fifteen feet behind them.[5] He then "immediately" heard Andrews say, "Get on the ground. Get on the ground," followed by "wrestling" and a gunshot. Robinson denied being a lookout, but he admitted that he stood outside the front door and was facing away from the house when the shooting occurred because he turned away when he heard a commotion. The three men then ran back to the car, where Andrews told them, "It went bad. I shot him…. The idiot grabbed my gun." According to Phillips, Kane responded, "You didn't have to shoot him." At that point, Andrews threatened the group, stating, "You don't know anything. You weren't here. And if you say anything, I'll kill you and your family."

¶7      The State presented evidence that Phillips and Robinson may have known Andrews to carry a gun on prior occasions. It also presented the testimony of a jailhouse informant who had shared a cellblock with Robinson. The informant claimed that Robinson told him that "everybody knew there was a gun going into the incident."[6] The informant did not claim, however, that Robinson told him that the group was there to rob Velin.

¶8      Joseph Archambeau, a neighbor of Velin, also testified for the State. He stated that on the night of the homicide, he saw three people walking quickly down the sidewalk with their heads down, and it "didn't really seem normal."

---

[5] We note that throughout the investigation, Robinson provided conflicting information regarding his involvement in the murder, which was addressed on cross-examination.

[6] Robinson specifically denied that he had shared this information, claiming only that he gave the jailhouse informant the police report. At trial, it was revealed that the informant had read about Robinson's case in the newspaper before being moved to the cellblock with Robinson. Further, while the informant denied asking for any consideration for coming forward with this information, he did admit to confrontations with Kane at the jail, and he had threatened that if Kane did not leave him alone he was going to testify against someone on the case.

According to Archambeau, the people were walking "side by side"[7] down the sidewalk, and they had something pulled up over their noses, such as a bandana or t-shirt.

¶9 On June 10, 2016, the jury found Robinson guilty of felony murder as a party to the crime. On October 5, 2016, the circuit court sentenced him to eighteen years' initial confinement followed by ten years' extended supervision.

¶10 On March 6, 2020, Robinson filed a motion for postconviction relief raising multiple claims of ineffective assistance of trial counsel and seeking a new trial in the interest of justice on the ground that Andrews did not testify at his trial. Robinson claimed that Andrews gave multiple statements following Robinson's trial that demonstrated that Robinson was innocent because Robinson had no knowledge of a plan to rob Velin. The circuit court held an evidentiary hearing on the motion.

¶11 At the *Machner*[8] hearing, Robinson's defense counsel testified. He stated that he was an experienced defense attorney who had practiced criminal law for forty-three years and conducted at least 100 jury trials. A year earlier, however, he suffered a stroke while driving that resulted in a severe car accident, and he explained that he had no memory of this case as a result of brain injuries suffered in the crash. Defense counsel was unable to provide testimony regarding his investigation of Robinson's case or the strategic choices he made during trial.

---

[7] When presented with Archambeau's conflicting testimony that Robinson was seen walking with the other men, Robinson claimed that he jogged and caught up with Andrews and Dunn and "walked with them" to Velin's house.

[8] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Robinson also testified at the hearing, claiming that defense counsel did not attempt to contact or call Andrews to testify at his trial. Robinson attempted to call Andrews to testify at the *Machner* hearing, but Andrews refused to testify.

¶12 The circuit court denied Robinson's motion for a new trial with regard to all of the ineffective assistance of counsel claims and in the interest of justice. Robinson appeals.

## DISCUSSION

### I. Ineffective Assistance of Counsel

¶13 To demonstrate constitutionally ineffective assistance of counsel, Robinson must establish both that defense counsel performed deficiently and that the deficient performance prejudiced his defense. *See **Strickland v. Washington***, 466 U.S. 668, 687 (1984). Whether a defendant has been denied constitutionally effective assistance of counsel is a mixed question of law and fact. ***State v. Savage***, 2020 WI 93, ¶25, 395 Wis. 2d 1, 951 N.W.2d 838 (citation omitted). We will not overturn a circuit court's findings of fact unless those findings are clearly erroneous. ***Id.*** We review de novo whether counsel performed deficiently and, if so, whether counsel's deficient performance was prejudicial to the defense. ***Id.***

¶14 "To demonstrate deficient performance, the defendant must show that his [or her] counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." ***State v. Shata***, 2015 WI 74, ¶56, 364 Wis. 2d 63, 868 N.W.2d 93 (citations omitted). "[T]he required test is that counsel must be 'adequate.'" ***State v. Williquette***, 180 Wis. 2d 589, 605, 510 N.W.2d 708 (Ct. App. 1993) *aff'd*, 190 Wis. 2d 677, 526 N.W.2d 144 (1995). "This does not mean the best counsel that might have tried the case, nor the best

defense that might have been presented." *Id.* "Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." *Id.* (citation omitted). In considering ineffective assistance claims, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "counsel is strongly presumed to have rendered adequate assistance." *Strickland*, 466 U.S. at 689-90.

¶15 To establish prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Savage*, 395 Wis. 2d 1, ¶32 (citation omitted). However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89. "A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one." *State v. Smith*, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

¶16 The circumstances of Robinson's claims of ineffective assistance of counsel in this case are unique. As noted above, while the circuit court held an evidentiary hearing on Robinson's postconviction motion and defense counsel testified, counsel had no recollection concerning the details of his representation due to subsequent health issues. As relevant here, when counsel cannot appear at a *Machner* hearing to explain or rebut a defendant's allegations "because of death, insanity or unavailability for other reasons ... [t]he defendant must support his [or her] allegations with corroborating evidence," including "letters from the attorney to the client, transcripts of statements made by the attorney or any other tangible evidence." *See State v. Lukasik*, 115 Wis. 2d 134, 140, 340 N.W.2d 62 (Ct. App. 1983). "In other words, we will presume that counsel had a reasonable basis for

his [or her] actions, and the defendant cannot by his [or her] own words rebut this presumption." ***Id.***

### a. Failure to Investigate and Present Testimony from Andrews

¶17 First, Robinson argues that defense counsel's failure to investigate and present testimony from Andrews at his trial constituted deficient performance. As the circuit court noted, "[i]t is undisputed that … Andrews was the co-defendant that actually shot and killed … Velin." According to Robinson, Andrews made statements on several occasions *after* Robinson's trial, and *after* Andrews had been convicted and sentenced in his own case, admitting full responsibility for the murder and denying that his codefendants knew anything beyond a plan to attempt to purchase marijuana. For example, Robinson explained that Kane hired a defense investigator who spoke with Andrews on June 20, 2017—approximately two years after Andrews' conviction and one year after Robinson's conviction. The investigator's report states that during that interview,

> [Andrews] stated that Kane and [Robinson] had absolutely no knowledge of his intentions to rob [Velin]. He stated that "They had nothing to do with what I had going on" and that Kane and [Robinson] were "Just along for the ride." He told them that he was going to [Velin's] house to buy marijuana and he asked them if they wanted to come along. [Andrews] said that no one present during the incident knew that he was carrying a firearm or that he intended [to] use it to rob [Velin]. He further stated that no one assisted him in planning the robbery.

Andrews admitted that "initially, he was upset with Kane and [Robinson], as he felt that they betrayed their friendship by going to the police," but he asserted that "he has matured since he was incarcerated nearly 3 years ago and, although he is still upset, he wants to do what is right."

8

¶18 When Andrews was called to testify at Kane's first postconviction hearing on August 17, 2017, however, he refused to testify and stated, "Y'all can kiss my mother-fucking ass." Then, on June 17, 2018, Andrews wrote a letter to the circuit court, explaining that Robinson, Kane, and Phillips did not know he "was gonna/planed [sic] to rob Garth Velin, they had no knowledge of any of it until after it happened." Andrews asked for another opportunity to testify.

¶19 At Kane's second postconviction hearing, on September 14, 2018, Andrews did testify. Andrews explained that there were no discussions with his codefendants that day about a robbery because he "never planned it." He testified he did mention to his codefendants that he "was going over to Superior to get some money and do a—a drug transaction, but that was it." He also testified that his codefendants did not know he had a gun. Andrews explained that Velin owed him money for some marijuana Andrews had loaned to Velin previously and that he had informed Velin on the phone the day before that he was coming over to pick up the money. He stated that they parked at the Subway because Kane "was on probation at the time, and he … didn't want to be around any drug houses or drugs, period. So, you know, he kind of stayed away."

¶20 Andrews testified that Robinson and Dunn left the car and came with him because "they wanted to buy some weed, some marijuana … but [Andrews] had told them to stay outside because, you know, I mean, if I am going into a drug dealer's house, I don't want to bring a bunch of people with me." Andrews did not recall sending Phillips to Velin's door first to check if anyone was home, and

contrary to his prior statements, he explained that he did not plan to rob Velin.[9] Instead, Andrews testified that he and Velin "had an argument over the money [Velin] owed [Andrews]. So in the process, the argument, the gun was pulled, you know, and we wrestled for it, and … everything went bad from there." According to Andrews, he initially turned down an offer from the State to testify against his codefendants because it was "unjust" and Kane "wasn't guilty."

¶21    On December 11, 2020, when Robinson attempted to call Andrews to testify at his own postconviction motion hearing, Andrews once again refused to testify. Instead, Andrews held up his middle fingers on both hands and told the judge "to fuck off."

¶22    The circuit court concluded that defense counsel was not ineffective for failing to call Andrews at Robinson's trial because the decision not to call Andrews was a reasonable strategic decision. In reaching this conclusion, the court relied in part on Kane's defense attorney's testimony at Kane's

---

[9] At the hearing, the circuit court asked follow-up questions to confirm that Andrews' testimony was that he did not go to Velin's home with the intent to rob Velin and that Andrews was carrying a gun that day for protection. When the court noted the inconsistencies among Andrews' statement to Kane's investigator and the letter Kane wrote and his testimony at the hearing, Andrews stated: "[M]y understanding is that the [c]ourt perceived that is what I went there to do is rob Garth Velin. So that's how I presented it to you, but that's not what I went there for." The court stated in its decision on Robinson's postconviction motion: "It is also worth noting that Andrews'[] testimony is also inconsistent with the elements to the charge of felony murder to which Andrews entered a plea of guilty."

10

postconviction motion hearing.[10] At that hearing, Kane's defense counsel stated that he had spoken to Andrews' counsel and mentioned potentially calling Andrews as a witness. Kane's counsel testified that "[t]he attorney basically told me that, you really don't want to do that…. [H]e gave me the impression or suggestion that … there are issues regarding [Andrews'] credibility, but also his reliability, or that he might say something that would implicate my client and damage my theory of the case."

¶23 Further, the circuit court observed that Andrews' multiple statements contradicted each other as well as Robinson's own trial testimony. For example, as noted above, Andrews' testimony at Kane's postconviction motion hearing was that he did not intend to rob Velin, but that was not the same information he provided to Kane's investigator and in his letter to the court. Additionally, as the State explained, Andrews' statement that he, Robinson, and Dunn left the car together also contradicted Robinson's trial testimony that he waited in the car for

---

[10] We note that Robinson questions the propriety of using Kane's defense attorney's testimony given that the testimony was not presented at the hearing in Robinson's case. Robinson claims "[t]hat evidence was known to [the circuit court] from having presided over the co-defendants' cases." Beyond these conclusory statements, however, Robinson's argument is undeveloped and lacking any citation to legal authority. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Accordingly, we will not address this issue further, except to make two observations. First, the relevant transcript from Kane's postconviction motion hearing, where his defense attorney's testimony was taken under oath, was included in the record on appeal. Second, Robinson, for all intents and purposes, appears to concede this argument as he relies on Andrews' testimony from Kane's postconviction motion hearing to support his own arguments on appeal. This hearing transcript was not entered into the record during Robinson's postconviction motion hearing, and Andrews did not testify during Robinson's hearing. Thus, Robinson's position on this point is inconsistent with Robinson's own arguments on appeal.

Robinson also makes several other arguments for why it is problematic to rely on Kane's defense attorney's testimony, essentially because counsels' strategies may not have been the same. We note, however, that the deficient performance standard is "judged by an objective test, not a subjective one." **State v. Jackson**, 2011 WI App 63, ¶9, 333 Wis. 2d 665, 799 N.W.2d 461.

thirty to forty-five seconds and then followed Andrews and Dunn because he got bored. Further, Andrews stated that Kane was on probation and "didn't want to be around any drug houses or drugs, period," but Robinson testified that they had gone to their grandparents' house to obtain marijuana and Kane was "part of this discussion." In summary, the court "wholeheartedly" agreed with the State's argument that "[t]he decision not to call Andrews was perhaps the wisest decision any trial attorney could have made in this case. The benefits were far outweighed by the risks."

¶24 On appeal, Robinson argues that "there is no evidence that [defense counsel] investigated this issue, or whether he had a strategic reason for not calling Andrews to testify." Thus, Robinson claims, in the absence of evidence that defense counsel investigated Andrews' testimony, it was erroneous for the circuit court to rely on testimony from Kane's attorney "regarding the investigation *he* performed, and the strategic decisions *he* made prior to *Kane's* trial." We disagree. The court relied only in part on the strategic decisions of Kane's defense attorney, who we agree was in a similar position to Robinson's attorney and had similar motivations. Regardless of whether Robinson's defense attorney conducted the same investigation or whether Andrews' defense attorney shared the same concerns with Robinson's counsel, the deficient performance standard is "judged by an objective test, not a subjective one." *See* **State v. Jackson**, 2011 WI App 63, ¶9, 333 Wis. 2d 665, 799 N.W.2d 461. Thus, we conclude that Robinson's defense counsel did not perform deficiently because his conduct in not calling Andrews to testify at Robinson's trial fell within what a reasonably competent defense attorney could have done under the circumstances.

¶25 In addition, we agree with the State that Robinson is attempting to flip the burden in this case. The parties do not dispute that Robinson's defense

counsel's medical issues and memory loss rendered him essentially "unavailable." *See Lukasik*, 115 Wis. 2d at 140. As noted above, "we will presume that counsel had a reasonable basis for his [or her] actions" unless the defendant "support[s] his [or her] allegations with corroborating evidence." *Id.* Robinson's "no evidence" arguments do not rebut that presumption. Instead, Robinson has failed to present sufficient corroborating evidence of counsel's alleged ineffectiveness and merely relies on his own self-serving testimony to establish deficient performance. *See id.*

¶26 In summary, we agree with the circuit court that the decision not to call Andrews to testify at Robinson's trial was a reasonable strategic decision under the circumstances. First, there is no evidence that Andrews would have testified had defense counsel called him at Robinson's trial. Further, as noted above, Andrews' testimony certainly suffered from credibility concerns as well as unpredictability—as demonstrated by his refusal to testify on at least two occasions and his disrespectful treatment of the court. Andrews' testimony also contradicted Robinson's testimony on multiple points. Finally, we agree with the State that given Robinson's defense counsel's forty-three years of experience practicing criminal defense law, it would be "inconceivable that … counsel would have somehow managed to overlook or forget about Andrews—who was the shooter and was also his client's codefendant—in his preparation for trial." This assertion finds support in defense counsel's testimony that it was his usual practice to "look[] into the issue of whether to try to call a codefendant." For these reasons, Robinson has failed to demonstrate that defense counsel was deficient by not calling Andrews.

*b. Failure to Obtain Transcripts from Codefendants' Trials and Impeach Witnesses*

¶27 Second, Robinson argues that defense counsel was ineffective for failing to impeach two witnesses—Archambeau and Phillips—with evidence from his codefendants' previous trials. At Robinson's postconviction motion hearing, defense counsel had no memory of whether he obtained or reviewed transcripts from Kane's and Dunn's trials where Archambeau and Phillips had already testified, but Robinson argues that additional investigation revealed that counsel had not reviewed those transcripts.[11] Nevertheless, Robinson argues that even if defense counsel had reviewed the trial transcripts, counsel failed to impeach Archambeau and Phillips with their statements.

¶28 As to Archambeau—Velin's neighbor—Robinson claims that "little was done to challenge the credibility or reliability" of Archambeau's testimony. According to Robinson, "[t]he strongest evidence the State presented suggesting the existence of a planned robbery was testimony from … Archambeau claiming to have seen three young men walking toward the victim's house wearing bandanas or t-shirts covering the lower portion of their faces." At Robinson's trial, when asked whether he noticed what the men were wearing, Archambeau testified: "No, I really didn't. I know that they had like hooded sweat shirts or jacket type thing on and jeans. They had something pulled up above their—up to

---

[11] According to Robinson, the court reporter for Kane's trial stated that defense counsel had not requested copies of those transcripts, and the transcripts from Dunn's trial were not prepared until December 2019, while Robinson's trial took place in June 2016. However, the record citations that Robinson includes to support these propositions do not provide support for his assertions. It is not our responsibility to search the record to seek out evidence in support of Robinson's argument. *See **Grothe v. Valley Coatings, Inc.**, 2000 WI App 240, ¶6, 239 Wis. 2d 406, 620 N.W.2d 463, *abrogated on other grounds by **Wiley v. M.M.N. Laufer Fam. Ltd. P'ship**, 2011 WI App 158, 338 Wis. 2d 178, 807 N.W.2d 236; **Pettit**, 171 Wis. 2d at 646-47.

their noses, like a tee-shirt or bandana like covering their faces, kind of." Later, he reiterated that the men "had something obstructing their view of below their nose down."[12]

¶29 Robinson argues that Archambeau's prior testimony demonstrates that he could have "easily" been impeached, but defense counsel failed to do so. For example, Archambeau testified at Kane's trial that when he saw the three men walking, "it was near dusk, there were no streetlights, he couldn't see the skin color of the three guys, and he couldn't remember the color of their hats or their hoodies." Further, Archambeau had four prior criminal convictions. *See* WIS. STAT. § 906.09 (2019-20).[13] Robinson also argues that "the transcript from Kane Robinson's trial showed Archambeau was prone to exaggerating or misremembering events." For instance, Archambeau testified that he got a "weird feeling" about seeing the men walking, which prompted him to go into his basement, but he told the police during the investigation that he "was not concerned" after seeing the men walking because "there is a lot of foot traffic in the area." According to Robinson, defense counsel did not explore any of these issues at Robinson's trial.

¶30 The circuit court found that failing to impeach Archambeau on these grounds was not "objectively unreasonable" under the circumstances of this case. As the State argues, "Archambeau's statements were remarkably consistent," and while he did testify at Kane's trial regarding a "weird feeling," he also explained

---

[12] At trial, Robinson testified that he did not have a face covering, and he did not see the others with any face coverings.

[13] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

that he "had a feeling that just told me *not to be concerned* with whatever they were doing, for myself, not to invest—in whatever they were doing," which is consistent with what Archambeau told law enforcement.[14]  (Emphasis added.) Further, Archambeau explained that he saw three men walking quickly past his house, but he could not identify them.  Robinson, however, testified at trial that he followed thirty to forty-five seconds behind Andrews and Dunn.  Had defense counsel attempted to impeach Archambeau with his prior statements, not only would it have highlighted the fact that his statements were consistent over time, but it also would have highlighted the contradiction with Robinson's own testimony.  To Robinson's point that Archambeau was not "challenged based on the lack of surrounding detail," defense counsel did question Archambeau regarding the time of night that he saw the men and whether it was dark, with Archambeau responding that "[i]t was getting to be dusk, yes, but I could still see."

¶31     As to defense counsel's alleged failure to impeach Archambeau with his prior convictions, the circuit court recognized that "Archambeau offered considerable testimony at trial that was favorable to" Robinson.  For example, Archambeau testified that the men were not doing anything "illegal or improper," and defense counsel's questioning led to Archambeau admitting that "it was kind of towards the fall of the year"—September 30—and "it's possible for somebody

---

[14] The circuit court also noted that Archambeau never told law enforcement that he remained in his living room after watching the three men walk by; whether he went into the basement was not addressed in the report.  Thus, Archambeau's testimony at Kane's trial and his statement to law enforcement are not necessarily contradictory.

to [cover their face] intentionally to keep from getting cold" due to "lake wind and stuff."[15]

¶32    Ultimately, the circuit court concluded that defense counsel's failure to impeach Archambeau further was a strategic decision, given that defense counsel argued during his closing statement:

> I don't disbelieve Mr. Archambeau in any way.  I think he believes he's telling the truth.  And I believe he did the best that he could.  But I think that he misconstrued what was happening, and, if, in fact, it is what he saw, if he saw them walking fast, it certainly is not something that would suggest that they were going to pull a robbery.

Given our high deference to counsel's performance, our presumption that counsel had a reasonable basis for his actions, and Robinson's failure to introduce corroborating evidence, we agree that defense counsel did not perform deficiently under the circumstances by not challenging Archambeau's testimony further.

¶33    As to Phillips, Robinson asserts that defense counsel performed deficiently by failing to question Phillips about whether the men were wearing bandanas or anything covering their faces to specifically challenge Archambeau's testimony.   According to Robinson, Phillips had given multiple statements denying that the men were wearing anything over their faces, but defense counsel failed to question Phillips on this point during Robinson's trial.  We agree with the circuit court, however, that because Phillips did not accompany the men to Velin's home, she would not know whether they were wearing bandanas or had pulled their shirts up over their noses during the walk from the car to Velin's home and

---

[15] This line of questioning from defense counsel—attempting to explain the men's behavior based on the weather—also appeared to relate to Archambeau's testimony that the men were walking briskly with "their faces pointed down toward the ground."

back. Defense counsel did not perform deficiently by failing to ask Phillips this question.

### c. Failure to Present Facts Undermining the "Plan"

¶34 Robinson next argues that several other facts were not discussed at trial that would tend to undermine the idea that the group had a "plan" to rob Velin. In particular, Robinson explains that defense counsel did not discuss "the juxtaposition of wearing bandanas to conceal their faces while parking at a public place and walking down sidewalks in front of houses where they could easily be seen and walking up to the victim's front door to conduct a robbery in view of the public." Robinson testified at the *Machner* hearing that there was a backdoor to Velin's residence that was off a back alley, and the group was aware of this access point because they drove through that alley to get to the Subway parking lot. According to Robinson, "if this was a plan and everyone was involved, the co-defendants would have known about these things, and would have known where to go to rob the victim while minimizing the possible risk of being seen."

¶35 Further, Robinson argues that if there was a planned robbery and Phillips was the getaway driver, then why was the vehicle not "even parked in a way to make a quick getaway"? For example, Phillip's testimony at Dunn's trial revealed that the vehicle was not "parked in a manner [she] could get out easy" and that she "had to back up and then go."

¶36 Finally, Robinson states that "no one mentioned an even bigger flaw in the 'plan' theory of robbery—the co-defendants had observed [Velin's father] walk into the Velin residence right after Phillips walked away and didn't see him

leave."[16]  Robinson argues that if there had been a plan to rob Velin, they would not have gone through with the plan while a witness was potentially present in the home.  According to Robinson, defense counsel did not ask Phillips or Robinson whether they saw Velin's father go inside Velin's home or whether they knew if Velin's father was still there.

¶37  The circuit court did not find these arguments convincing, ultimately determining that "[s]ome of the facts were indeed presented to the jury" and defense counsel's "failure to somehow highlight these relatively insignificant facts by way of argument at trial" was not prejudicial.  Robinson responds to the court's reasoning by arguing that while some of the evidence was found in the record— such as the fact that there was a back alley and that Phillips testified that she parked facing the Subway, which she showed to the jury on a map—"[t]he deficiency lies in [defense counsel's] complete failure to make use of this available evidence and arguing its importance to the jury."

¶38  We conclude that defense counsel did not perform deficiently.  We agree with the circuit court that most of the information Robinson claims defense counsel failed to introduce was in fact introduced at trial.  As to Velin's father, we agree with the State that the evidence demonstrates that Robinson would likely have known that Velin's father had left before committing the robbery.  Robinson testified at his postconviction motion hearing that he saw Velin's father at the door before Phillips first went to Velin's door, but he did not specifically see whether or

---

[16] Velin's father testified that he went to Velin's home on September 30, 2014, to drop off a toaster, and he parked in front of Velin's house.  According to Velin's father, there were no other cars visible on the street.  He stated that he saw a female with dark hair walk away from Velin's door, and Velin told him that the female was looking for a lost dog.

not he left.[17] At trial, however, Velin's father testified that he drove a distinctive car—a green 1994 Corvette—and his car was the only one parked on the street at that time. Thus, the implication is that Robinson would have known that Velin's father was gone when they approached the house again because the car was not there, which the State speculates is why defense counsel did not investigate this line of questioning. Regardless, the evidence was presented to the jury. To Robinson's point that defense counsel could have done more to highlight this evidence, counsel's representation "need not be perfect" or "even very good, to be constitutionally adequate." *See **Williquette***, 180 Wis. 2d at 605 (citation omitted). Under these circumstances, and given our "highly deferential" standard of reviewing counsel's performance, *see **Strickland***, 466 U.S. at 689-90, we cannot conclude that defense counsel was constitutionally ineffective.

### d. Failure to Call Robinson's Grandparents to Testify

¶39     Next, Robinson argues that defense counsel was ineffective for failing to call his grandparents to testify. Before driving to Velin's home, the group first stopped at the home of Robert Craven, Sr., and Louise Baldwin, Robinson and Kane's grandparents. According to Robinson, the group was attempting to obtain some marijuana, but Craven did not have any in his possession. He did, however, give Robinson a small amount of money. During the investigation, Craven spoke to law enforcement and informed the detective that "the boys were in great spirits, laughing and joking around. Not nervous, not

---

[17] The circuit court made a point to note that Robinson's trial testimony and postconviction motion hearing testimony were inconsistent on this point. At trial, he testified that he saw Velin's father arrive after Phillips had been at Velin's home, while at the motion hearing he testified that he saw him before Phillips went to Velin's door.

in a hurry to get going." Likewise, Baldwin told the detective that "the boys were happy, all smiles, good spirits" and gave her "love and kisses."

¶40 Further, while Craven did not testify at Robinson's *Machner* hearing, Craven did testify at Kane's postconviction motion hearing that "Kane said he needed a loan" and that Craven "had $10 on [him]," and he asked Kane "if that was enough; if not, [he] would run to the ATM and get more, and [Kane] said the ten would do." Craven also specifically testified at Kane's hearing that he *did* have marijuana that night, that he "always" has marijuana for medical reasons, and that the boys "could have" obtained marijuana from Craven "whenever they wanted" but he "didn't allow it on a continuous basis."[18] Craven did not testify that Robinson and Kane asked him for marijuana that night.

¶41 Robinson testified that he wanted his grandparents to testify at his trial, explaining that their testimony was "important" for his "theory of defense" because it countered "the logic of the State's 'plan' theory." In other words, Robinson argued in his postconviction motion that

> Craven (and, to a lesser extent, Baldwin) would have corroborated the fact that [Robinson] and [Kane] stopped over at their house, were in high spirits and joking around, and asked for money, like to purchase marijuana. This detracts from the State's theory that they conceived a plan in Duluth to rob Garth Velin …. Their information lends support to [Robinson's] testimony that he intended to purchase weed, not steal it.

---

[18] When questioned about his previous statements to law enforcement about the marijuana, Craven testified that he had not told "the whole truth" because he did not "want to incriminate [himself]."

According to Robinson, the prosecutor, during closing arguments, "contested whether it ever happened, arguing, 'there's no real evidence that they went for a joy ride over to Superior to visit [their] grandfather.'"

¶42    The circuit court concluded that defense counsel was not deficient by failing to call Craven or Baldwin. In particular, the court stated that it "seemingly was a strategic trial decision" and that "[t]his was the same strategic decision made by the lawyers for the other two co-defendants who took their cases to trial and did not call [Robinson's] grandparents as witnesses."

¶43    We agree. First, Baldwin's contribution to the case that the boys "were happy, all smiles" would have been minimally relevant to any of the issues at trial. As to Craven, we agree with the State that "[i]t would have been a bad idea to tell the jury [through Craven's testimony] that immediately before an alleged robbery attempt, [Robinson] and Kane had been out looking for money but were only able to secure $5 or $10 from their grandparents." Further, Robinson testified at trial that he asked Craven for marijuana, but "[h]e didn't have any," which Craven specifically contradicted during his testimony at Kane's postconviction motion hearing. Under the circumstances, we conclude that it was a reasonable trial strategy to not call Craven or Baldwin, given that their testimony could have damaged Robinson's case rather than bolster it. *See **Bergmann v. McCaughtry***, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.").

### e.  Failure to Call Robinson's Former Girlfriend to Testify

¶44    Finally, Robinson argues that defense counsel performed deficiently by failing to call his former girlfriend, Antoinette Huff, to testify. Robinson

testified at the *Machner* hearing that he spoke to his girlfriend on the night of the shooting and told her everything. According to Robinson, Huff would have testified, based on her interview with law enforcement on December 12, 2014, that Robinson told her about the shooting, informed her about Andrews' threats "to kill everyone if anyone told what happened," and stated to her that he did not know that Andrews had a gun. Huff was not called to testify at the *Machner* hearing.

¶45    The circuit court determined that defense counsel did not perform deficiently. The court reasoned that Huff would not have corroborated Robinson's testimony because "[m]erely 'parroting' what someone else tells you is not 'corroboration.'" The State agrees that defense counsel was not deficient, as Huff "had no first-hand knowledge of anything that occurred in this case," and her alleged testimony "would have been merely cumulative because there was never any doubt that [Robinson] denied knowing Andrews had a gun." Further, Robinson fails to rebut the presumption that counsel had a reasonable basis for his actions by offering any corroborating evidence that defense counsel failed to call Huff due to an oversight or neglect.

¶46    Given the circumstances, however, we conclude that even if defense counsel performed deficiently by failing to call Huff to testify, Robinson has failed to establish prejudice. A statement from Robinson's then-girlfriend that simply parroted what Robinson told her—which Robinson himself and Phillips had already told to the jury—would not have created a reasonable probability of a different result at trial.

## II. New Trial in the Interest of Justice

¶47    Finally, Robinson seeks a new trial in the interest of justice under WIS. STAT. § 752.35 on the ground that the real controversy was not fully tried.[19] Robinson claims that the real controversy was not fully tried because "the jury did not hear any testimony from the shooter, Chance Andrews, who has now admitted that none of his co-defendants knew that he was armed or that he was going to rob the victim."   (Formatting altered.)   Under the circumstances, we conclude that Robinson has failed to demonstrate that this is a rare, exceptional case warranting a new trial in the interest of justice.

¶48    Under WIS. STAT. § 752.35, we possess a broad power of discretionary reversal, *see* ***Vollmer v. Luety***, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990), and we may exercise that power where it appears from the record that (1) "the real controversy has not been fully tried"; or (2) "it is probable that justice has for any reason miscarried," § 752.35.[20]   "[T]he real controversy has not been tried if the jury was not given the opportunity to hear and examine evidence that

---

[19] We note that Robinson argues that "[t]he circuit court failed to analyze the lack of Andrews' exculpatory statements at trial under the interest of justice rubric and apply the correct standards of law," but he observes that "[t]he court's memorandum decision acknowledged that the defense raised this argument."   Traditionally, we review a circuit court's decision on a postconviction motion for a new trial in the interest of justice under the erroneous exercise of discretion standard.  *See* ***State v. Hurley***, 2015 WI 35, ¶30, 361 Wis. 2d 529, 861 N.W.2d 174.  On appeal, however, Robinson appears to rely on WIS. STAT. § 752.35, which by its plain terms is limited to "an appeal to the court of appeals."   Thus, we will review Robinson's arguments de novo.

[20] As noted, Robinson does not argue that the second basis for reversal—that "justice has for any reason miscarried," *see* WIS. STAT. § 752.35—is applicable in this case.  That standard requires that we conclude that there is a substantial probability of a different result on retrial. *See* ***State v. Schumacher***, 144 Wis. 2d 388, 401, 424 N.W.2d 672 (1988) (citing ***State v. Wyss***, 124 Wis. 2d 681, 735, 370 N.W.2d 745 (1985)); *see also* ***State v. Maloney***, 2006 WI 15, ¶14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436.  As Robinson does not rely on this § 752.35 standard, we do not discuss it further.

bears on a significant issue in the case, even if this occurred because the evidence or testimony did not exist at the time of trial." *State v. Maloney*, 2006 WI 15, ¶14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436 (citing *State v. Hicks*, 202 Wis. 2d 150, 160-61, 549 N.W.2d 435 (1996)). We "approach[] a request for a new trial with great caution." *State v. Avery*, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). Reversals in the interest of justice should be "rare and reserved for exceptional cases." *State v. Kucharski*, 2015 WI 64, ¶41, 363 Wis. 2d 658, 866 N.W.2d 697.

¶49 The only issue under WIS. STAT. § 752.35 applicable in this case is whether the real controversy concerning Robinson's involvement in Velin's robbery and resulting murder was fully tried. In other words, as Robinson explains, "[t]he real controversy was whether, prior to the shooting, [Robinson] knew Andrews intended to commit armed robbery against … Velin, and if so, whether [Robinson] intentionally aided and abetted the commission of that crime."[21] Robinson argues that had the jury heard Andrews' statements—admitting full responsibility for the crime and denying that his codefendants had any knowledge of his carrying a gun or intention to rob Velin, as noted above—the jury could have reasonably concluded that Robinson was not a party to the crime of felony murder. Robinson asserts that "[t]he absence of Andrews'

---

[21] The elements of complicity, or aiding and abetting, "are that a person (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further (2) he [or she] consciously desires or intends that his [or her] conduct will yield such assistance." *State v. Hecht*, 116 Wis. 2d 605, 620, 342 N.W.2d 721 (1984) (citation omitted). "[W]here one person knew the other was committing a criminal act, he [or she] should be considered a party thereto when he [or she] acted in furtherance of the other's conduct, *was aware* of the fact that a crime was being committed, and acquiesced or participated in its perpetration." *Id.* (citation omitted); *see also* WIS. STAT. § 939.05; WIS JI—CRIMINAL 1032 (2022).

statements, which go directly to the heart of the controversy and are completely exculpatory, precludes the real controversy from being tried."

¶50  We conclude that the absence of Andrews' testimony at Robinson's trial did not prevent the real controversy from being fully tried.  The jury heard testimony from both Robinson and Phillips that neither one knew that Andrews brought a gun or that he intended to rob Velin that day.  Further, the State presented no *direct* testimony challenging Robinson's and Phillips' assertions on that point, other than from the jailhouse informant regarding Robinson's knowledge that Andrews brought a gun.  Even Robinson acknowledges that while Andrews' testimony would be corroborative, it would also be cumulative, because "at a new trial, there would be *three witnesses* saying there was no planned robbery, no discussions of a robbery, no discussions of a gun, and that Andrews acted alone."  The jury at Robinson's trial heard this testimony from two witnesses already.

¶51  Further, as we discussed above, Andrews' statements and actions made after Robinson's trial were certainly problematic.  As the State argues, there is no evidence that Andrews would testify if Robinson was granted a new trial.  However, even if, as Robinson argues, Andrews' testimony from Kane's postconviction motion hearing would have been admissible because he was an unavailable witness under WIS. STAT. § 908.045(1), Andrews provided various contradictory statements—contradictory to both Andrews' own statements as well as Robinson's testimony at trial.  Those contradictory statements, in conjunction with Andrews' unpredictability, raise legitimate concerns regarding whether

Andrews' testimony would harm rather than help Robinson's defense.[22] We disagree with Robinson's assertion that "[w]hatever else a jury would believe about Andrews as a person, that testimony would be credible and uncontroverted." *See State v. Poellinger*, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990) (observing that the jury is the sole arbiter of credibility of witnesses and charged with the duty of weighing the evidence); *see also State v. Jackson*, 188 Wis. 2d 187, 200 & n.5, 525 N.W.2d 739 (Ct. App. 1994) (explaining that "the once-unavailable defendant who now seeks to exculpate his [or her] co-defendant lacks credibility, since he [or she] has nothing to lose by testifying untruthfully regarding the alleged innocence of the defendant seeking a retrial." (citation omitted)).

¶52    In support of his position, Robinson cites *Garcia v. State*, 73 Wis. 2d 651, 245 N.W.2d 654 (1976), calling it "analogous" to this case. We disagree. In *Garcia*, the "major facts in dispute at the trial were the identification of the defendant and his alibi that he was not there." *Id.* at 655. A witness at trial positively identified Garcia as a suspect in the robbery, but, after trial, another suspect stated that Garcia was not present or involved in the crime. *Id.* at 653-54. Our supreme court reasoned that "all of the material evidence as to [the issues at

---

[22] Robinson suggests that this rationale is "the equivalent of finding Andrews 'incredible as a matter of law.'" He cites *State v. Jenkins*, 2014 WI 59, ¶64, 355 Wis. 2d 180, 848 N.W.2d 786, and *State v. Guerard*, 2004 WI 85, ¶¶46-49, 273 Wis. 2d 250, 682 N.W.2d 12, for the proposition that "[m]ere inconsistencies and contradictions cannot make a witness's testimony 'incredible as a matter of law,' and cannot automatically defeat the value of statements fully exculpating the defendant." These cases do not provide support for his assertion under these circumstances. First, Robinson does not develop this argument beyond merely citing these two cases. *See Pettit*, 171 Wis. 2d at 646-47. Further, both *Jenkins* and *Guerard* addressed inconsistencies in testimony based on ineffective assistance of counsel claims, not in the interest of justice. Finally, as noted above, Andrews' testimony posed issues other than those related to inconsistent statements.

trial] was not presented to the jury" and "the record [did] not reveal this was an intentional strategic maneuver by [Garcia's] counsel." *Id.* at 655.

¶53 ***Garcia*** is factually distinct. Apart from the fact that ***Garcia*** involved the misidentification of a suspect, no witness in Robinson's trial ever testified that Robinson knew that Andrews had a gun *and was planning to use it to rob Velin*; thus, Andrews' testimony does not directly challenge testimony at trial in a similar manner to the testimony at issue in ***Garcia***. Accordingly, the absence of Andrews' testimony at Robinson's trial did not prevent the real controversy from being fully tried, and this is not one of the rare, exceptional cases in which a new trial in the interest of justice is warranted.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.